IN THE UNITED STATED DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

VFB LLC,                          )
                                 )
                Plaintiff,        )
                                 )
        v.                        )        Civil Action No.  02-137 KAJ
                                 )
CAMPBELL SOUP CO., et al.,        )
                                 )
                Defendants.       )


## POST-TRIAL FINDINGS OF FACT AND CONCLUSIONS OF LAW

---

James J. Maron, Esq., Maron & Marvel, P.A., 1300 N. Broom Street, Wilmington,
Delaware 19806; Counsel for Plaintiff.
  Of Counsel:  John A. Lee, Esq., Robin Russell, Esq., David P. Griffith, Esq.,
        William S. Locker, Esq., Joe Holzer, Esq., Andrews Kurth LLP, 600 Travis,
        Ste. 4200, Houston, Texas 77002

Neal C. Belgam, Esq., Dale R. Dubé, Esq., Blank Rome LLP, 1201 N. Market Street,
Ste. 800, Wilmington, Delaware 19801; Counsel for Defendants.
  Of Counsel:  Richard P. McElroy, Esq., Mary Ann Mullaney, Esq., Blank Rome
        LLP, One Logan Square, 18th & Cherry Streets, Philadelphia,
        Pennsylvania 19103
                Michael W. Schwartz, Esq. David C. Bryan, Esq., Forrest G.
        Alogna, Esq., Wachtell, Lipton, Rosen & Katz, 51 W. 52nd Street, New
        York, New York 10019

---

September 13, 2005
Wilmington, Delaware

TABLE OF CONTENTS

Page

I.    INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1

II.   FINDINGS OF FACT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  2

      A.    Parties . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  2

      B.    The Decision to Spin-Off VFI . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  4

      C.    Selecting the Management Team . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  6

      D.    Negotiations Between VFI and Campbell . . . . . . . . . . . . . . . . . . . . . . . .  9

      E.    The VFI Businesses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  12

            1.    FY1997 Financials . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  16

            2.    FY1998 Financials . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  19

      F.    The Spin-off . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  23

      G.    VFI's Credit Facility . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  27

      H.    VFI's Stock Price . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  30

      I.    VFI's 1999 Operating Plans . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  32

      J.    The 1999 Bond Offering . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  34

      K.    Sale of VFI Businesses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  36

      L.    Post Bond Issuance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  40

      M.    Bankruptcy . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  41

III.  CONCLUSIONS OF LAW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  43

      A.    Fraudulent Transfer . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  43

            1.    Standing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  44

            2.    Constructive Fraudulent Transfer . . . . . . . . . . . . . . . . . . . . . . . .  47

a.     Reasonably Equivalent Value ...................... 48

      i.     Price of VFI's Stock ........................ 52

      ii.    Opinions Regarding the VFI Businesses
           Fair Market Value Formed Independently
           of This Litigation .......................... 58

      iii.   Dr. Luehrman's Comparable Company
           Analysis ................................. 60

      iv.   Mr. Owsley's Comparable Company
           Analysis ................................. 62

      v.     Mr. Owsley's DCF Analysis .................. 63

      vi.   Actual Cash Flows ........................ 67

b.     Inadequate Capitalization ......................... 68

c.     Insolvency .................................... 69

   3.    Actual Intent to Defraud ............................... 70

B.   Breach of Fiduciary Duty ..................................... 72

C.   Campbell's Proof of Claims .................................... 73

D.   Alter Ego and Illegal Dividend ................................ 73

IV.   SUMMARY OF CONCLUSIONS .................................... 74



**JORDAN, District Judge**

I.    INTRODUCTION

VFB L.L.C. ("VFB") brought this action against Campbell Soup Company, Campbell Investment Company, Campbell Foodservice Company, Campbell Sales Company, Campbell Soup Company, LTD. (Canada), Joseph Campbell Company, Campbell Soup Supply Company, L.L.C., Campbell Soup Company L.L.C., Northeastern Products Company, Southeastern Wisconsin Products Co., Inc., and Pepperidge Farm, Incorporated (collectively "Campbell"), alleging that Campbell engineered a fraudulent transfer from VFB's predecessor in interest, Vlasic Foods International Inc. ("VFI"), to Campbell of more than $600 million in cash and assumed liabilities, that Campbell controlled VFI's directors and caused them to breach their fiduciary duties to VFI, that VFI illegally paid dividends to Campbell, that Campbell was the alter ego of VFI, and that Campbell's Proof of Claim against VFI's bankruptcy estate is either voidable or should be equitably subordinated.  (Docket Item ["D.I."] 45, ¶ 699-759.)  The following are my post-trial findings of fact and conclusions of law, issued pursuant to Federal Rule of Civil Procedure 52(a).

1

## II.     FINDINGS OF FACT[1]

### A.     Parties

1.     Plaintiff VFB is the successor-in-interest to VFI (D.I. 45 at ¶ 3, the "Complaint"), which was a wholly-owned subsidiary that Campbell spun-off to its shareholders (the "Spin" or "Spin-off") on March 30, 1998. (Defendant's Trial Exhibit ["DTX"] 501 at '1552.)[2] Campbell transferred to VFI a group of businesses (the "VFI Businesses") which had been grouped together within Campbell prior to the Spin and were known as the "Specialty Foods" division. (D.I. 356, n.9.) As part of the Spin-off, Campbell also transferred a $500 million debt obligation to VFI. (D.I. 285, Ex. A, ¶ 15.) On the date of the Spin-off, Campbell transferred its shares of VFI stock to its shareholders, so that Campbell's shareholders then owned shares of Campbell and, separately, shares of VFI.[3]  (Id., ¶ 3.)

2.     For reasons discussed in detail herein, VFI did not succeed as an independent company, see infra, ¶¶ Findings of Fact ["F"] 72-91, and, on January 29,

---

[1]Throughout these Findings of Fact and Conclusions of Law, I have adopted without attribution language suggested by one side or the other in this dispute. In all such instances, the finding or conclusion in question has become my own, based upon my review of the evidence and the law.

[2]Citations to page numbers over four digits have been abbreviated using an apostrophe. All abbreviated citations are to documents of such length that the last four digits of the page number is adequate for accurate identification of the cited page.

[3]Campbell and VFI's fiscal years (FY) ran from August through July, ending the Sunday closest to July 31. (D.I. 285, Ex. A at ¶¶21, 22.) Campbell spun-off VFI on March 30, 1998, two months into the third quarter of Campbell and VFI's FY1998. (Id.) The Specialty Foods division was created in the beginning of FY1998 and operated within Campbell until it was transferred to VFI during the Spin-off. See infra, ¶¶ F45, F56.

2001, it filed a petition for reorganization under Chapter 11 of the Bankruptcy Code, (D.I. 45, at ¶¶ 1, 3). VFB was created pursuant to VFI's Chapter 11 plan to permit creditors an opportunity to pursue the claims now at issue. (Id.)

     3.     The majority (95.8%) of the VFB creditor interests, measured by value, arose from a $200 million subordinated, unsecured bond offering conducted approximately fifteen months after the Spin-off. (DTX 618 at '9014; DTX 501; D.I. 318 at 1603:7-17 (McCarthy[4]).)  The bonds were issued by VFI pursuant to full SEC disclosure on June 29, 1999. (Id.) Another creditor interest represented by VFB is VFI's headquarters landlord, whose allowed claim in the bankruptcy is $1.66 million. (Plaintiff's Trial Exhibit ["PTX"] 1114; PTX 1122; D.I. 318 at 1586:9-23 (McCarthy).) Campbell entered the lease before the Spin-off, and VFI assumed it on the date of the Spin. (PTX 632 at '408; D.I. 318 at 1586:24-87:11 (McCarthy); PTX 705.) VFB also represents the interests of various employee claimants who joined VFI from Campbell in the Spin-off. (D.I. 318 at 1586:3-8 (McCarthy); D.I. 319 at 1911:18-12:3 (Carter[5]); D.I. 317 at 1208:25-10:2 (Lummis[6]); PTX 15.) Lastly, VFB represents trade creditors.

---

    [4] Unless the identity of a deponent is already clear from the text, citations to transcripts are followed by a parenthetical identifying the deponent or a reference to a page herein where the identity is explained.  Where a citation identifying a deponent appears for the first time in a footnote, rather than in text, the parenthetical follows immediately after the name.  Ms. Kathy M. McCarthy is a tax attorney who was asked by Campbell in "late August or early September" of 1998 to assist in the possible sale of VFI assets. (D.I. 318 at 1543:18-25, 1544:1-6 (McCarthy).)

    [5]See infra, ¶ F17.

    [6]Eric Lummis ran the Campbell Customer Service Center from its formation until the Spin-off closed. (D.I. 317 at 1161:25, 1162:1 (Lummis).)

(D.I. 318 at 1589:2-6, 1592:5-20 (McCarthy); PTX 1132; PTX 1223; PTX 1224; DTX 618 at '9008-12.)

4.    Defendant Campbell Soup Company is a public company organized under New Jersey law. The other defendants are corporate affiliates of Campbell Soup Company. (D.I. 45 at ¶¶ 6-15.)

B.    The Decision to Spin-Off VFI

5.    Beginning in 1996, Campbell initiated a strategy to improve its performance. It perceived itself as already being "Best in Class," in the sense of being among the best food companies, but it wanted to move to "Best in Show," ranking with the best consumer products companies. (PTX 91 at '1055; D.I. 318 at 1717:19-1718:25 (Walker[7]).) Working with its financial advisor, Goldman Sachs & Co. ("Goldman"), Campbell's management identified a number of strategies to achieve that ambition, including reconfiguring its portfolio of businesses. (PTX 201 at '1013-15; PTX 91 at '1055, '1068.) The planned reconfiguration was to consist of identifying and keeping core businesses, evaluating speciality businesses, and, following the evaluation, divesting non-performing ones. (PTX 91 at '1068.)

6.    Goldman recommended that Campbell spin-off non-strategic businesses to Campbell's shareholders. (PTX 233 at '9650.) According to Goldman, the spin-off could be accomplished relatively expeditiously and with no tax impact on Campbell, the newly spun company, or their shareholders. (PTX 233 at '9645; PTX 241 at '0885.)

---

[7]Tom Walker is the "Managing Partner or Managing Director at Goldman." (D.I. 318 at 1702:2 (Walker).)

4

7.     Campbell decided to take "aggressive action" to achieve Best in Show status and, in keeping with Goldman's advice, began exploring a leveraged spin-off it dubbed "Project Sweetpea."  (PTX 101 at '9414; D.I. 317 at 1244 (Anderson[8]); D.I. 318 at 1726-29, 1733 (Walker); PTX 174 at '487; D.I. 315 at 606 (Lord[9]); D.I. 319 at 1978-79 (DiSilvestro[10]); 200 at '8745.)  Many of the business that were ultimately included in the VFI Spin-off were included in the early Project Sweatpea planning.[11]  (*Id.*)

8.     Campbell and Goldman contemporaneously explained in Project Sweetpea documents, and other related documents, Campbell's purpose in pursuing the Spin-off.  Campbell believed that selling the businesses singly was "not attractive" and would be "time consuming," that it would involve "business difficulties," divert management attention, and depress Campbell's earnings per share.  (PTX 172 at '7032; PTX 174 at '3487.)  However, Campbell was also concerned that selling the businesses as a group would raise "uncertainty" and result in a "price discount," as the

_____

[8]  *See Infra,* ¶ F12.

[9]  *See Infra,* ¶ F23.

[10]Anthony DiSilvestro was the Vice President/Treasurer of Campbell and, before the Spin, of VFI as well.  (D.I. 319 at 2036:19-23 (Emmet (Richard Emmet was a Director of Strategic Planning and Corporate Development at Campbell (D.I. 319 at 2024:7-8 (Emmet)))).)

[11]For a description of all of the different lines of businesses included in the Spin-off *see infra,* ¶ F28.

5

sale would be "limited to financial buyers."[12] (PTX 172 at '7032; PTX 174 at '3487; D.I. 318 at 1733-34 (Walker); D.I. 319 at 1981-82 (DiSilvestro).)

9.    By comparison, Campbell viewed a spin-off as a transaction that could be "completed quickly," had "certainty," would "minimize senior management time," and was "potentially tax free." (PTX 172 at '7031, 7033; PTX 174 at '3487; D.I. 318 at 1733, 1736 (Walker).)

10.    Further, Campbell decided that, by leveraging the Spin-off, it could "receive value similar to a sale" while "control[ling] the process." (PTX 172 at '7033; D.I. 317 at 1249 (Anderson); PTX 174 at '3487; PTX 173; D.I. 318 at 1733, 1749, 1753 (Walker); PTX 180 at '0731; PTX 233 at '9648.)

C.    Selecting the Management Team

11.    During the initial phases of the Spin-off planning, David W. Johnson was Chief Executive Officer ("CEO") and Chairman of the Board of Directors of Campbell. (D.I. 322 at 3038:1-7 (Johnson).) He resigned his position as CEO in July of 1997, but continued to serve as Chairman of the Board. (Id.)

12.    In March of 1996, Campbell hired Basil Anderson to be its Chief Financial Officer ("CFO"). (D.I. 315 at 606 (Lord).) As CFO, Mr. Anderson was heavily involved with the planning and financial aspects of the Spin-off. (D.I. 315 at 606-607 (Lord).)

13.    In 1997, in anticipation of Mr. Johnson's stepping down as CEO, Dale Morrison and Robert Bernstock were competing to be his successor. (D.I. 322 at

---

[12]The reason for that concern was Campbell's belief that other food companies would not view the VFI Businesses, as a group, as a strategic addition. (D.I. 318 at 1733-34 (Walker).)

6

3029:4-7 (Sripada[13]).) After a "very close vote," Mr. Morrison was selected to become Campbell's new CEO and began his tenure in July of 1997. (D.I. 322 at 3051:3-6, 3054:7-16 (Johnson).)

14.    Mr. Bernstock was naturally disappointed that he was not selected for the position. (D.I. 322 at 3054:18 (Johnson).) Shortly after receiving the news, he asked Mr. Johnson to recommend him to Campbell's Board as the CEO for the contemplated Spin-off company, which came to be known as VFI. (D.I. 322 at 3054:22-25, 3055:1-7 (Johnson).)

15.    Mr. Johnson had reservations about Mr. Bernstock's ability to manage a highly leveraged business. (D.I. 322 at 3055:25, 3056:1-23 (Johnson).) Mr. Johnson was concerned that, given Mr. Bernstock's background in marketing, he was not accustomed to managing a business for cash.[14] (Id.) Mr. Johnson believed that Mr. Bernstock would still do a good job, however, because he was a "top executive" and had "conquered assignment after assignment" in many different roles at Campbell. (D.I. 322 at 3059:17-3060:7, 3055:21-24 (Johnson).) Mr. Bernstock was ultimately selected to be the CEO for the newly formed VFI. (D.I. 322 at 3060:6-12 (Johnson).)

---

[13]Before the Spin-off, Srini Sripada was a marketing manager for Swanson. (D.I. 322 at 2991:4-5 (Sripada).)

[14] At trial, one of Campbell's expert witnesses, Michael Silverstein, explained that "managing a company for cash" meant that money should not be invested in advertising, research and development, or any type of innovation. (D.I. 323 at 3372-73 (Silverstein).) In addition, expenses should be minimized in order to maximize the amount of cash generated. (Id.) Mr. Silverstein is a Senior Vice President at the Boston Consulting Group. In 1997 he was hired by Campbell "to take an independent view as to whether or not [the Spin-off] made sense." (D.I. 323 at 3351:9-16, 3353:2-4 (Silverstein).)

7

16.     Kathleen MacDonnell was the Campbell executive who had been running the businesses that ultimately formed the bulk of VFI's operations, namely Vlasic brand pickles and Swanson brand frozen foods. (D.I. 322 at 3059:2-16 (Johnson); 2434:1-5 (Bernstock).) Ms. MacDonnell also wanted to be chosen to lead the contemplated spin-off company. (*Id.*) She believed that Vlasic and Swanson were burdened with unnecessary overhead costs and that, if she could run those businesses outside of Campbell's bureaucracy, she could increase their value. (D.I. 322 at 3059 (Johnson).) After Mr. Bernstock was selected to head VFI, Ms. MacDonnell left Campbell to join another company. (D.I. 322 at 3060-61 (Johnson).)

17.     In September 1997, Norma Carter, who was a lawyer in Campbell's in-house legal department, was selected as the general counsel of VFI. (D.I. 319 at 1832 (Carter).) In her 17 years at Campbell, Ms. Carter had acquired extensive experience in mergers and acquisitions, had served as counsel to the Swanson business and other Campbell subsidiaries, and had "significant experience" drafting and negotiating supply and co-packing agreements. (D.I. 319 at 1916:19-1919:21, 1920:20-1921:19, 1922:16-1923:7 (Carter); D.I. 321 at 2842:5-2843:3 (Lipscomb[15]).)

18.     Ms. Carter was told that there was a strong possibility that if she stayed with Campbell she would be elevated to the position of General Counsel. (D.I. 319 at 1925-26 (Carter).) Nevertheless, when given the choice between potentially becoming General Counsel for Campbell or becoming general counsel for VFI, Ms. Carter chose

---

[15] *See infra*, ¶ F23.

8

VFI, based on what she termed "a lot of knowledge" she had acquired about the Spin-off. (*Id*.)

19.     Many other well-regarded Campbell executives who were familiar with the VFI Businesses chose to cast their lot with VFI. James Dorsch, who joined VFI as head of the pickle business, had worked at Vlasic for over 10 years and was very familiar with its operations. (D.I. 315 at 293:23-25, 296:19-297:2 (Dorsch).) Mark McCallum, who joined VFI as the head of its mushroom production business, had been running that business within Campbell for a year before the Spin-off. (PTX 1 at '0926; D.I. 321 at 2592:9-2393:2 (McCallum).) Carlos Funes had been CEO and President of Swift, a processed meat business, since 1983, and he remained as CEO of Swift-Armour ("Swift") after the Spin-off. (PTX 1 at '0925; D.I. 322 at 3183:2-9, 3184:4-6 (Funes).) For the role of CFO, VFI brought in an outsider, William R. Lewis. (D.I. 314 at 83:24-25, 84:1 (Lewis).)

20.     That seasoned executives familiar with the businesses that came to constitute VFI chose to join VFI demonstrated that thoroughly knowledgeable people believed the Spin-off would be a successful venture.

D.     Negotiations Between VFI and Campbell

21.     Campbell recognized that VFI's viability depended on finding an aggressive and highly accomplished CEO. (PTX 303.) However, Campbell also recognized that negotiating with such a CEO over the terms of the Spin-off would be problematic if certain terms were not identified beforehand as being non-negotiable. (*Id*.)

9

22.    The non-negotiable terms included (1) the businesses and assets to be transferred, (2) areas and terms of non-competition between Campbell and VFI, (3) the initial debt level for the new company, (4) the protocol for handling external communications, (5) transition service fees payable to Campbell, and (6) restrictions on soliciting Campbell employees. (PTX 302 at '262; PTX 303 at '156-57; D.I. 322 at 2943-44 (Lipscomb); PTX 233 at '648; D.I. 318 at 1753 (Walker); D.I. 320 at 2405-06, 2431-32 (Bernstock); PTX 330 at '226; PTX 324 at '662.)

23.    Mr. Lord, Mr. DiSilvestro, and Ms. Lipscomb, all three of whom were Campbell executives before and after the Spin-off, served as VFI's pre-Spin directors. (D.I. 321 at 2806-07 (DiSilvestro); D.I. 321 at 2853-54, 2857, 2927 (Lipscomb); D.I. 316 at 650 (Lord).)  As VFI directors, they approved the agreements reached between negotiators from VFI's management team and negotiators for Campbell.  (*Id.*)

24.    Mr. Bernstock and Ms. Carter represented VFI in discussions regarding the negotiable aspects of the Spin.  (D.I. 321 at 2853:3-2854:12 (Lipscomb); D.I. 319 at 1832 (Carter).)  Campbell, however, still held most of the power in these negotiations and dictated many of the terms of the ultimate agreement.  (PTX 233 at '648; D.I. 318 at 1753 (Walker); D.I. 320 at 2405-06, 2431-32 (Bernstock); PTX 324 at '662.) Examples of agreements in which Campbell drove a particularly hard bargain included certain co-packing agreements[16] for frozen foods and supply agreements for mushrooms.

---

[16]Co-packing is when one company packages food and another company sells that food under its own brand.  (D.I. 319 at 1877-78 (Carter).)

10

25.     With respect to co-packing, VFI entered into short-term agreements where VFI would package food for Campbell at bargain rates. (PTX 12 at §3.1, Sch. B; D.I. 316 at 725:7-19, 726:16-23 (Czerpak); D.I. 317 at 1326:1-7 (Parker[17]); D.I. 319 at 2077:17-20 (Miller); D.I. 321 at 2910:14-20 (Lipscomb).) When negotiating the supply agreements for mushrooms, Campbell changed the way in which it had historically ordered mushrooms and began insisting on much lower minimum orders. (D.I. 314 at 271:1-72:25 (Reitnauer); D.I. 317 at 1360, 1362-63 (Parker).)

26.     VFI was not powerless in these negotiations, however. The mere threat that the Spin-off might not be completed in a timely manner, and the potential financial effect of such a failure, gave VFI some negotiating leverage. (See PTX 303.) Despite later complaints from VFB witnesses, it appears that Campbell's negotiations with VFI were at arm's length, with qualified and competent negotiators on both sides of the table.[18] That VFI representatives may have been unhappy with terms they believed favored Campbell is a natural result of the give and take of negotiation. Even if Campbell and VFI had not been related, the size and market power of Campbell gave it extraordinary leverage in negotiations with its suppliers. It used its power to extract concessions from longtime friends and coworkers at VFI, which was distressing to them but was not hidden from anyone.

---

[17]Steven Parker was Director of Worldwide Purchasing for Campbell at the time the Spin-off was announced. (D.I. 317 at 1276:6-11 (Parker).)

[18] Ms. Carter, who was one of the people in charge of those negotiations, had extensive experience negotiating on behalf of Campbell. See supra, ¶ F17.

11

E.     The VFI Businesses

27.     While the management teams for VFI and Campbell were negotiating the terms of the Spin-off, another contentious negotiation was occurring between the two camps over how the VFI Businesses would be operated during the period leading up to the Spin-off. *See infra*, ¶¶ F45-53. To understand how the pre-Spin operation of the VFI Businesses affected Campbell, it is necessary to examine the financial condition of the VFI Businesses and the impact they had on Campbell.

28.     The businesses that were ultimately included in the Spin-off were, by Campbell's estimation, underperforming businesses, businesses with low growth potential, or businesses with low profit margins. *See infra*, ¶¶ F29-39. They included: (1) Vlasic, a U.S. retail and food service line, predominantly selling pickles and condiments; (2) Swanson, a U.S. retail frozen food line; (3) Swanson Canada, a Canadian retail frozen food line; (4) Vlasic Farms, a line of fresh mushrooms; (5) Swift-Armour ("Swift"), an Argentinean processed beef line; (6) Open Pit, a Midwest regional barbecue sauce line; (7) Stratford-Upon-Avon ("SonA"), a U.K. canned beans and pickled vegetables line; (8) Freshbake, a U.K. frozen foods line; and (9) Kattus, a German specialty foods distribution company.[19]  (D.I. 45, ¶ 83.)

29.     The two most valuable companies included in the Spin-off, and the two that were intended to form the strategic core of the new company, were Swanson and Vlasic.  (PTX 269 at '9157; D.I. 323 at 3371-72 (Silverstein).)  The rest of the included

---

[19]The names of these businesses are short-hand designations given by the parties. Some of the businesses may have been separate companies, while others were only products lines within a company. Such distinctions were not made by the parties nor are they relevant in this dispute.

12

businesses generally had declining sales, unpredictable profits, and low value. (PTX 269 at '9160; D.I. 323 at 3372-73 (Silverstein).) According to a consultant hired by Campbell, these other companies should be managed solely for cash; money should not to be invested in advertising, research and development, or any type of innovation. (D.I. 323 at 3372-73 (Silverstein).)

30.     Although Swanson and Vlasic were profitable companies, they did not have strong growth prospects prior to the Spin, which was part of the reason they were spun-off. (PTX 248 at '0957; PTX 269 at '159; PTX 261 at '591.) They did, however, have strong brands and a history of stable revenue, earnings, and cash flow performance. (Id.)

31.     Vlasic is a company famous for its pickles. For 15 years prior to the Spin-off, Vlasic held between 27% and 31% of the U.S. pickle market. (DTX 648 at '372, '376-8; D.I. 354 at 4388:20-4389:11 (Bess[20]).) Vlasic had "better margins by far than most food companies" (DTX 28 at 2), had strong brand equity, enjoyed a leading position in the market, and was profitable. (D.I. 323 at 3374:10-23 (Silverstein); D.I. 354 at 4432:2-8 (Bess).)

32.     From 1984 until 1994, however, sales of Vlasic pickles decreased on average 1.8% per year. (PTX 1196.) In 1994, Vlasic successfully introduced a product consisting of pickles sliced lengthwise, which it called "Sandwich Stackers.". (D.I. 315 at 297 (Dorsch); PTX 1196; PTX 1176; PTX 1037 at '238; D.I. 320 at 2401 (Bernstock);

---

[20]John Bess, is currently an employee of IBM in their Business Consulting Services Division. He testified as an expert on behalf of Campbell. (D.I. 354 at 4379, 4381:10-25, 4382:1-5 (Bess).)

D.I. 315 at 501 (Silverstein); PTX 248 at '955; PTX 269 at '194; D.I. 351 at 3648 (Blattberg[21]).) The introduction of Sandwich Stackers increased consumption of Vlasic pickles, increased margins for Vlasic, and was a driving force behind record earnings for the brand in FY1996/1997. (*Id.*)

33.    Although there was an upturn in the sales of Vlasic pickles through FY1996/1997, Vlasic increased its income during this time primarily through increased prices and hence increased margins. (PTX 1196; PTX 1176; PTX 1037 at '238; D.I. 315 at 501 (Silverstein); PTX 248 at '955; PTX 269 at '194; D.I. 351 at 3648 (Blattberg).)

34.    By mid-FY1997, competitors had introduced products similar to Sandwich Stackers, which curtailed Vlasic's growth spurt. (D.I. 315 at 298, 363 (Dorsch); PTX 276 at '539; PTX 260 at '584; D.I. 315 at 501-02 (Silverstein); PTX 248 at '955.) Vlasic, however, was still considered to have the prospect of future growth.

35.    Swanson, the owner of a well-known frozen food brand, was the other company that formed the core operations of VFI. (PTX 269 at '159; PTX 261 at '591; D.I. 315 at 513 (Silverstein).) Although Swanson was a relatively large company, it was a "[s]lowly shrinking business, ... losing volume share," in a "[l]ow growth category," with "significant and growing challenges from" competitors, and "[h]igh fixed cost manufacturing." (*Id.*) Campbell was advised by its consultants that, if Swanson were

---

[21]Robert C. Blattberg is "Polk Brothers Distinguished Professor of Retailing at the Kellogg School of Management, Northwestern University." He was "asked to evaluate the state of three major businesses for VFI: Vlasic Pickles, Swanson Frozen Foods and Open Pit Barbecue Sauce." (D.I. 351 at 3586:22, 3587:1-2, 3589:17-25, 3590:1-3 (Blattberg).) At trial he testified as an expert for VFB.

14

run as it had been, these "trends [were] likely to continue" with "[w]orsening [f]inancial [p]erformance," resulting in a steady decline in future earnings. (PTX 261 at '591; PTX 250 at '105-06; D.I. 315 at 507-08, 513 (Silverstein).) The Swanson brand, however, had a strong heritage, with brand equity and a loyal consumer following. (D.I. 323 at 3375:6-3376:10 (Silverstein); D.I. 354 at 4390:22-4391:3, 4432:9-12 (Bess).) Prior to the Spin-off, it was believed that, if Swanson were managed more effectively, those strengths could be used to turn around the business. (*Id.*)

36.    Consequently, although Vlasic and Swanson were viewed as under-performing companies and non-strategic within Campbell's portfolio of businesses, they were nevertheless solid, stable brands that were capable of forming the foundation of a newly created company.

37.    In contrast, the seven remaining companies that were to make up VFI had generally been poor performers and were viewed as having very limited upside potential. The strongest of the remaining companies was Swift. Swift was an Argentinian company that sold beef on the world market and in its domestic market. (PTX 924 at '763.) It had a history of stable earnings and had moderate growth prospects. (PTX 269 at '160.)

38.    Prior to the Spin-off, Campbell purchased beef from Swift at a price established by Swift's cost of production plus a 5% mark-up. (D.I. 317 at 1291 (Parker); PTX 63 at '971; D.I. 322 at 3189 (Funes).) Immediately before the Spin-off, that price was 20% above the then-prevailing market price. (*Id.*) This above-market purchase price, of course, increased Swifts' profits. Sales to Campbell, however, accounted for less than 20% of Swift's overall sales. (PTX 362 at '756.)

39. The rest of the businesses included in the Spin-off had declining sales, unpredictable earnings, and low value. (PTX 269 at '160.) These businesses were not viewed as having strategic value for VFI, so it was recommended that they be managed purely for cash. (*Id.*)

1. FY1997 Financials

40. The Form 10 filed with the Securities and Exchange Commission (the "SEC") to describe the Spin-off showed that the VFI Businesses had $116 million of earnings before interest and taxes ("EBIT") in FY1997.[22] (PTX 1 at '026.) That figure, however, was not entirely reliable, because the financial results for the Swanson business segment had been inflated. In April of 1997, the management of Swanson had projected that the business would earn $40 million of EBIT for the fiscal year, which was $10 million below its $50 million target. (PTX 163; D.I. 315 at 467 (Applegate[23]); D.I. 315 at 620 (Lord).) To help close the gap, Swanson's management recommended, among other things, that the company "load" products,[24] change its deduction

---

[22]EBIT is often used to measure how profitable a company is, without regard to debt.

[23]Stanley Applegate was the Assistant Controller for Business Planning at Campbell, until becoming Campbell's Finance VP in the spring of 1998. (D.I. 315 at 446:12-16 (Applegate).)

[24]Product "loading" occurs when a company increases sales and shipments of a product to retailers without there being a corresponding increase in consumption. The shipments increase the inventory carried by retailers or consumers but allow the manufacturer to book increased revenue. (D.I. 351 at 3600 (Blattberg).)

16

assumptions, use corporate reserves, and create more "last in first out" ("LIFO")[25] gains. (PTX 163 at '843; D.I. 315 at 619-20 (Lord).)

41.    It is unclear to what extent these suggested tactics were employed, but it is clear that business was not carried on as usual. One unusual step was the initiation of a special sales promotion in the 4th quarter of the fiscal year. Swanson normally ran four promotions a year to encourage customers to purchase Swanson frozen dinners. (D.I. 316 at 804-05 (Kessler[26]).) In June/July 1997, during the 4th quarter of its fiscal year and at a time of year when Swanson usually did not specifically promote its products, Swanson added a fifth promotion, the so-called "5th deal," to increase its sales and earnings. (PTX 142; D.I. 318 at 1636-1642 (Adler[27]); D.I. 316 at 705, 743 (Czerpak); D.I. 316 at 804-05 (Kessler); D.I. 322 at 3006-07 (Sripada); D.I. 317 at 1195-96 (Lummis).)

42.    The "5th Deal" employed heavy discounting, sweepstakes, and coupons to create a "huge spike in the business," selling 1.3 million more cases of product than had been sold in the 4th quarter of the previous year. (PTX 1037 at '235; D.I. 316 at 830-31, 833-34, 854 (Kessler); D.I. 318 at 1637-38 (Adler); D.I. 320 at 2465-68,

---

[25]According to one of VFB's experts, LIFO accounting allows a company to book paper gains by permitting its inventories to run low. (D.I. 352 at 3983:12-17 (Owsley(see infra, n.41)).)

[26]Murray Kessler was President of the Swanson Division at VFI before leaving in November of 1999. (D.I. 316 at 762:25, 763:1-9 (Kessler).)

[27]Joseph Adler was Vice President, Controller of VFI after the Spin-off. (D.I. 318 at 1610:11-16 (Adler).)

17

2471-72, 2580- 81 (Bernstock); PTX 142 at '757, ¶ 8; DTX 550 at '505; D.I. 317 at 1236-37 (Lummis); DTX 87 at 4; D.I. 354 at 4406 (Bess).)

43.    VFB argues that the "5th deal" resulted in a "pantry load," meaning that consumers bought more Swanson products than they normally would have, stored the extra product at home, and consequently bought less from Swanson in the months afterwards. (D.I. 356, ¶ F47.) The sales records for Swanson, however, do not show a drop in sales in the next two quarters, undercutting the conclusion that there was pantry loading. (DTX 550 at '3505.) Nevertheless, the "5th deal" increased FY1997 earnings in an artificial manner, because the full costs of that promotion were not recorded until FY1998. The exact amount of those unrecorded costs is unknown. (D.I. 320 at 2581 (Bernstock); PTX 377 at '466.)

44.    Swanson reported $48 million in EBIT in FY1997, despite a 7% decline in consumption, because it cut advertising, created the "5th Deal," delayed scheduled maintenance,[28] and under-accrued trade spending. (D.I. 315 at 399 (Bernstock), D.I. 320 at 2473-74 (Bernstock); PTX 1037 at '235-36.) As Swanson had been projecting $40 million in EBIT before it utilized those tactics, and it recorded $48 million in EBIT after using them, it is reasonable to conclude that they were responsible for the approximately $8 million increase in EBIT. Consequently, since those tactics chiefly involve cost-shifting, much of that $8 million increase was at the expense of FY1998

_____

[28]Swanson's scheduled July 1997 plant shutdowns were moved into FY1998, shifting almost $1 million of Swanson's overhead and expenses into FY1998. (D.I. 316 at 705-06 (Czerpak); PTX 166 at ¶ 4; PTX 150 at '632; D.I. 315 at 591 (Wright (William Wright was the Director of Operations Analysis for Swanson and Vlasic); PTX 276 at '544.)

18

EBIT.[29]  This shifting of costs into FY1998 and the consequent inflation of FY1997 EBIT added to the difficulties VFI would face in FY1998.

        2.     FY1998 Financials

45.     In anticipation of the Spin-off, Campbell reorganized at the beginning of FY1998 all of the VFI Businesses into what it named the "Specialty Foods" division.[30] The management team that was selected to run VFI became responsible for the operation of the Speciality Foods division. (See D.I. 320 at 2412, 2548-49 (Bernstock); D.I. 314 at 94-95 (Lewis); D.I. 315 at 315-16 (Dorsch).)

46.     Despite the struggle Swanson had experienced in reaching its FY1997 EBIT target, the managers of Swanson, at the behest of Campbell's management, set an EBIT target of $57.6 million for FY1998, a 20% increase over the previous year. (PTX 165 at '971; D.I. 315 at 592 (Wright); D.I. 320 at 2400 (Bernstock); D.I. 315 at 470-71 (Applegate).)

47.     Campbell executives were highly motivated to see VFI managers meet the Specialty Foods division's financial projections, no matter how unrealistic. (D.I. 319 at 1842-43 (Carter); PTX 528 at '344.) Those executives were part of an incentive program that rewarded them with significant bonuses, if they met their financial targets for three years in a row. (Id.) They had already achieved their FY1996 and FY1997

---

[29]It is likely that the "5th deal" also legitimately increased FY1997 EBIT to some unknown degree.

[30]VFB describes this reorganization in its proposed Findings of Fact and Campbell does not refute it. (D.I. 356 at 33, fn. 9.)

19

projections, and, naturally, wanted to meet their FY1998 projections in order to receive their bonuses.[31] (*Id.*)

48.     In FY1998, there were two particularly important earnings figures in the reported financial results for the Specialty Foods division. One was the year to date ("YTD") earnings for the second quarter, and the other was YTD earnings up until March 30, 1998, the date of the Spin-off (the "Spin-off YTD Earnings"). Second quarter YTD earnings were important because they were included in the pro-forma earnings section of the Spin-off disclosure document, *i.e.*, the Form 10. (PTX 1 at '905-06.) The Spin-off YTD Earnings were important because the Specialty Foods division's earnings for that period of time were attributed to Campbell.

49.     The original FY1998 EBIT target for VFI, which included the Specialty Foods division results prior to the Spin-off, was $159 million. (D.I. 320 at 2412 (Bernstock).) It was an unrealistic goal, and the first quarter began to prove it so. The Specialty Foods division's first quarter EBIT was $33 million, 23% below target.[32] (PTX 505 at '051; D.I. 315 at 627 (Lord).) Mr. Anderson, Campbell's CFO, pressured the management of the division to meet their target earnings for the second quarter,

---

[31]The unrealistically high numbers were, it appears, largely driven by the self-interest of Campbell executives like Basil Anderson and Anthony DiSilvestro, who had significant personal financial incentives at stake, because of Campbell's incentive program.

[32]Plaintiff alleges that "the VFI businesses [the Specialty Foods division] were $23 million behind FY1998 plan by December." (D.I. 356, ¶ F223.) A proper reading of the cited document, however, reveals that the number contained in the document referred to the division's percentage behind plan, not the amount behind plan. (PTX 505 at '051.) Doing the arithmetic, it appears that, by December, the Specialty Foods division was about $9.9 million behind plan YTD.

20

emphasizing that their bonuses were on the line. (D.I. 320 at 2412, 2548-49 (Bernstock); D.I. 314 at 94-95 (Lewis); D.I. 315 at 315-16 (Dorsch).)

50.    Despite such pressure, the Specialty Foods division continued to have difficulty achieving the target EBIT. (D.I. 320 at 2415-16 (Bernstock).) Accordingly, in the second quarter of FY1998, the banks which had extended credit to facilitate the establishment of VFI (the "Banks")[33] were informed that VFI's projected FY1998 EBIT was being lowered to $143 million. (DTX 381 at '004; D.I. 320 at 2038-42 (Emmet).)

51.    Also as a result of the division's problems staying on target, Mr. Bernstock made a presentation to Campbell's management in which he asked that the managers of the division have their bonuses calculated using only the results from the first half of FY1998. (PTX 498 at '647; D.I. 320 at 2548-50 (Bernstock).) Mr. Bernstock explained that if the Specialty Foods division were going to achieve second quarter targets, the costs incurred by doing so would prevent the division from achieving its third quarter targets. (Id.)

52.    Recognizing that the target EBIT numbers were unattainable, Mr. Anderson agreed to recommend to Campbell's Board of Directors that the EBIT target be lowered, so that the managers of the Specialty Foods division would still have an

_____

[33]The Banks consisted of Morgan Guaranty Trust Company of New York ("JP Morgan"), The Chase Manhattan Bank, Bank of America NT&SA, Bank of Montreal, Barclays Bank PLC, Citibank, N.A., Deutsche Bank AG New York, The First National Bank of Chicago, Fleet National Bank, Mellon Bank, N.A., PNC Bank, National Association, Wachovia Bank, N.A., The Bank of New York, The Bank of Nova Scotia, CoreStates Bank, N.A., SunTrust Bank, Atlanta, Westdeutsche Landesbank Girozentrale New York Branch, Banca Nazional Del Lavoro S.p.A. - New York Branch. (PTX 615 at '1117.)

21

incentive to deliver earnings.[34]  (D.I. 320 at 2548-50, 2557 (Bernstock).)  Mr. Anderson's recommendation was accepted by the Board, and the Specialty Foods division bonus target was reduced.  (D.I. 320 at 2548-50, 2556-59 (Bernstock); D.I. 323 at 3416-17 (Anderson); PTX 697 at '078-79.)  It is unclear exactly how the new bonus target was calculated, however.  The target number was lowered 10% and did not include Swift's results, which were about $11 million below target.  (Id.)  Additionally, some of Campbell's earnings from other divisions were attributed to the Specialty Foods division's earnings, so that the division could meet its already lowered financial target.  (Id.)

53.     To achieve its second quarter EBIT target, the management of the Specialty Foods division undertook to defer trade spending, sell assets, and to load product by providing customers with incentives to order products earlier than they ordinarily would.  (PTX 488; D.I. 320 at 2412-13 (Bernstock); D.I. 316 at 819-20, 822 (Kessler); PTX 497; PTX 498 at '650.)  These extraordinary measures allowed the managers of the Specialty Foods division to meet their second quarter financial targets.  However, prior to the Spin-off, VFI's projected FY1998 EBIT, which included the

---

[34]Maintaining the incentive was not without complications.  The managers for the Specialty Foods division knew that they would receive stock options at the time of the Spin-off and that those options would be priced at the trading price of VFI's shares on the date of the Spin.  (D.I. 1 at '930-31.)  Consequently, VFI's managers had an incentive to push down the opening price of their company's stock, in order to lower the strike price and increase the value of their options.  Thus, while VFI's managers wanted to get their bonuses from Campbell for delivering earnings, they also had an incentive to make VFI's performance appear less robust.  This is in addition to the obvious incentive to avoid harm to the future earnings potential of VFI, which would follow from being short-sighted in financial planning.

Specialty Foods division financial results, was lowered, first to $115 million, and then to $99 million. (DTX 381 at '2004.)

    F.    The Spin-off

    54.    The motivation for Campbell to engage in the Spin-off had at least three aspects. First, it was a matter of business strategy. Whether one takes the view expressed by Campbell, that it was simply refocusing on core businesses (see, D.I. 357, ¶¶ F5-14) or one takes the view expressed by VFB, that Campbell was sending its "dog" businesses to the pound (see, D.I. 356, ¶¶ F4-29, F374), the Spin-off was a strategic divestiture. Second, the Spin-off promised, and ultimately delivered an enormous tax benefit to Campbell. Specifically, the payment it received from VFI was tax free. See infra, ¶¶ F6, F62, F81, n.51. Third, and for valuation purposes most significantly, the Spin-off presented an opportunity for Campbell to take a healthy piece of cash out of the VFI Businesses.

    55.    The means Campbell employed to take cash was provided by the Banks. Campbell had arranged with the Banks to establish a $750 million line of credit for VFI (the "Credit Facility"). Campbell decided that it would take $500 million in cash from the Credit Facility and that VFI would take on the burden of that debt as part of the VFI capital structure. See infra, ¶ F63. The $500 million thus became payment to Campbell in exchange for the transferred business assets.

    56.    The Spin-off occurred on March 30, 1998. (DTX 501 at '1552; D.I. 285, Ex. A, ¶ 21.) During the Spin-off, Campbell transferred all of the businesses within the "Specialty Foods" division, i.e., the VFI Businesses, along with the business specific

23

Case 1:02-cv-00137-***-MPT    Document 376-1    Filed 09/13/05    Page 27 of 77 PageID #: 31

debt, to VFI. (*Id.*) In addition, as noted, Campbell transferred the $500 million Credit Facility debt to VFI. (*Id.*)

57. By the close of trading on the day of the Spin-off, VFI's stock price stood at $25.31 per share on the New York Stock Exchange. (DTX 1673; D.I. 319 at 1949:14-19 (Bernstock).) At that time, VFI had approximately 45 million shares outstanding, yielding an equity market capitalization of approximately $1.1 billion. (*Id.*) That figure represented the value the market placed on all of the businesses transferred to VFI at the time of the Spin-off, taking account of the attendant debt.

58. At the time of the Spin-off, the market priced VFI's stock knowing that VFI had taken on $500 million in debt as part of the Spin. I am called upon in this case to make a determination about the comparative value of VFI's payment to Campbell and the assets transferred from Campbell to VFI. *See infra*, ¶ Conclusions of Law ["L"] 15. The first order of business is determining what constituted the payment. The answer is the acceptance of the $500 million debt obligation.

59. The effect of viewing the $500 million Credit Facility debt as payment is, analytically, to remove that negative number as an encumbrance on or reduction of the value of the VFI Businesses. In other words, the market capitalization number of $1.1 billion must be increased by $500 million to gain a true view of the value of the businesses, leading to an implied value of $1.6 billion.[35] Both parties apparently agree that VFI's acceptance of the $500 million obligation Campbell incurred under the Credit

---

[35]This approach approximates but is not identical to estimating the enterprise value of the company. Enterprise value is the value of a company excluding the negative effect of all of its debt (*i.e.*, its market capitalization plus its debt). (D.I. 354 at 4638:2-16 (Luehrman (*see infra*, n.43)).)

24

Facility was payment for the VFI Businesses. (D.I. 356, ¶¶ L5-7; D.I. 362, ¶¶ L5-7.)
VFB argues, however, that all of the other obligations (the "Secondary Obligations")
owed by the VFI Businesses and transferred as part of the Spin-off, should also be
considered payment from VFI to Campbell.[36] (D.I. 356, ¶¶ L5-7.)  These Secondary
Obligations include such things as loans made from Campbell to VFI prior to the Spin-
off to pay for operating costs, debts due to suppliers, and numerous other expenses
incurred by VFI in its day-to-day operations, as well as things such as pension
obligations. (Id.)  These Secondary Obligations amounted to approximately $146.2
million. (Id.)

    60.    Undercutting VFB's position, however, is the behavior of the parties at the
time of the Spin-off.  While both sides appear to have seen the acceptance of the $500
million Credit Facility obligation as payment (D.I. 356, ¶¶ L5-6; D.I. 357, ¶ L8.), the
Secondary Obligations were treated as ordinary business obligations.  The loans from
Campbell to VFI prior to the Spin-off were treated as just that, loans.  VFI received cash
for taking on the corresponding obligations. (D.I. 285, Ex. A, ¶ 17.)  The other
Secondary Obligations, such as pension obligations, were taken on as an ordinary part
of doing business.  I thus conclude that the Secondary Obligations, while they had an

---

[36]Ultimately, however, the decision on whether these Secondary Obligations
constitute payment does not alter the outcome of the reasonably equivalent value
analysis.  I have relied heavily on VFI's stock price to determine the fair market value of
the VFI Businesses.  As creditors' claims stand in front of common stockholders'
claims, the price that common stock trades at reflects the value of the businesses, less
the amount of debt held by the company. If the Secondary Obligations were treated as
payment, they would simply be removed from consideration with respect to the value of
the VFI Businesses, thereby increasing the value of the VFI Businesses for the
purposes of a reasonably equivalent value analysis.

impact on the value of the VFI Businesses, were not viewed as, and should not be treated as, part of the payment made from VFI to Campbell.

61. The value the market placed on the VFI Businesses is of the utmost importance, but the legitimacy of that value necessarily depends on what information the market had when the shares in question were being traded. The Form 10 disclosed many key facts about VFI, specifically: (1) the lack of operating history as an independent company (PTX 1 at '0892; D.I. 318 at 1679:14-19 (Adler)); (2) the non-compete restrictions preventing VFI from manufacturing, distributing, marketing, or selling many products in competition with Campbell (PTX 1 at '0937); (3) the lack of ownership of the Swanson trademark and the limitations on the use of that mark (PTX 1 at '0895); (4) the terms of and risks under the Tax Indemnity Agreement ("TIA") (PTX 1 at '0875, 92-93, '0938-39; PTX 3); (5) one-time gains on asset sales and insurance proceeds, ten-year-high cattle costs, and higher effective tax rates at Swift (PTX 1 at '0917-18, '0956, '0971; D.I. 318 at 1682:7-22, 1683:22-25 (Adler)); (6) the short-term nature of the mushroom and beef supply agreements, co-packing agreements, and transition services agreement (PTX 1 at '0940; D.I. 321 at 2862:8-24 (Lipscomb)); (7) the declines in spending for marketing in FY1998 (PTX 1 at '0918; D.I. 318 at 1682:23-1683:18 (Adler)); (8) the 1998 sales volume declines of Vlasic pickles (PTX 1 at '0917, '0920); and (9) the expected $25 to $30 million pre-tax restructuring charges (PTX 1 at '0921).

62. VFB points to the TIA as one of the major causes of VFI's future troubles. (D.I. 356, ¶¶ F321-28.) In particular, VFB alleges that the TIA restricted VFI's "ability to sell its businesses for at least two years" and "restricted VFB's ability to issue common

26

stock to raise capital to reduce debt." (*Id.*, ¶ F321.) There can be no question, however, that the public was aware of the TIA at the time of the Spin-off. In addition to being singled out for mention twice in the Form 10, the TIA was attached to the Form 10 as exhibit 10.5. (PTX 1 at '0875, 92-93, '0938-39; PTX 3.) Moreover, such indemnity agreements are frequently a feature of spin-offs, to protect the transaction's tax-free nature. (D.I. 354 at 4585:5-4586:20 (Wessel); D.I. 320 at 2273:20-2276:21 (Hays).) Therefore, it is plain that the investing public knew of the TIA and how it affected the Spin-off.

G.   VFI's Credit Facility

63.   As earlier noted, Campbell executives had negotiated with the Banks prior to the Spin to create a $750 million Credit Facility. (PTX 615 at '1032; D.I. 315 at 605:3-15 (Lord).) Campbell borrowed $500 million and, by the terms of the Credit Facility, VFI was to assume all obligations under the agreement and Campbell would be released from such obligations. (PTX 615 at '1032) The remaining $250 million borrowing capacity belonged to VFI. (*Id.*)

64.   It appears that the Banks did not conduct an independent investigation of the performance of the VFI Businesses. (PTX 533 at '636-38; DTX 189 at '310; D.I. 319 at 2029-32 (Emmet); D.I. 314 at 96-97 (Lewis); PTX 400 at '244; D.I. 320 at 2431 (Bernstock).) Rather, they relied heavily on "pro forma" financial statements and projections supplied by Campbell. (*Id.*)

65.   In the third quarter of FY1998, VFI informed the Banks that the original EBIT projection that had been given to them, $143 million, was being adjusted downward to $99 million. (PTX 720 at '589-91; D.I. 314 at 98, 101-02, 104-06 (Lewis);

27

D.I. 318 at 1393 (O'Malley[37]); D.I. 320 at 2492-93, 2565 (Bernstock).) In a June board

meeting, VFI further lowered its EBIT estimate for the year to $70 million.[38] (PTX 760 at

'004.) At the time, VFI attributed 60-70% of the drop in FY1998's estimated EBIT to de-

loading of product (*i.e.*, shipping less product than usual, with the aim of bringing down

customer inventories to normal levels), 20-25% of the drop "from softness in Argentina

and Germany," and 10-15% of the drop to "weaker consumption trends than had been

expected for Vlasic and Swanson." (PTX 760 at '005.)

66.     At the $99 million target, VFI did not believe it was in breach of any of the

covenants in its loan agreement with the Banks.[39] (D.I. 314 at 113-14 (Lewis).)

However, at the $70 million EBIT target, the managers believed that VFI would be in

breach of the covenants by the end of FY1998. (D.I. 314 at 114-115 (Lewis).) Knowing

it would soon be in default, VFI set out to amend the Credit Facility. (D.I. 314 at 118

---

[37]Shaun Flynn O'Malley, the Chairman Emeritus of PriceWaterhouse LLP, was
one of the original directors of VFI. (D.I. 318 at 1389:19-21, 1390:8-9 (O'Malley).)

[38]Although documentation from that board meeting states, and testimony
confirms, that the FY1998 EBIT estimate at the prior board meeting was $99 million,
documentation from the prior board meeting states that the EBIT estimate for the year
was $99 million minus a $26 million dollar restructuring charge. (PTX 720 at '586, 89;
D.I. 314 at 114-15 (Lewis).) It is unclear if the later EBIT estimate is merely a
reaffirmation of that earlier estimate, including the restructuring charge, or if VFI's
estimated EBIT had dropped to $70 million not including the restructuring charge. In
any event, the financial condition of VFI was worsening.

[39]The pertinent covenants included a minimum Debt/EBITDA Ratio and a Fixed
Charge Coverage Ratio. (PTX 615 at '1080.) EBITDA means earnings before interest,
taxes, depreciation, and amortization. Debt/EBITDA Ratio is defined as "the ratio of (I)
Consolidated Debt at the end of such Fiscal Quarter to (ii) Consolidated EBITDA for the
period of four consecutive Fiscal Quarters then ended." (*Id*. at '1038.) Fixed Charge
Coverage Ratio is defined as the "ratio of Consolidated EBITDA for the period of four
consecutive Fiscal Quarters then ended to Consolidated Interest Expense for such
period of four consecutive Fiscal Quarters." (*Id*. at '1040.)

(Lewis).) To that end, VFI invited the Banks in June and July of 1998 to perform a due diligence review of its financial performance. (D.I. 314 at 118-19 (Lewis).) This turned out to be a contentious process in which the Banks exhaustively examined VFI's finances. (D.I. 314 at 118-121 (Lewis).)

67. At the end of July, JP Morgan, which was the lead bank on the Credit Facility, made a presentation to the other Banks. (PTX 1227 at '9975; D.I. 314 at 120-121 (Lewis).) Included in that presentation was the conclusion that VFI warranted a BB credit rating.[40] (PTX 1227; D.I. 314 at 120-121 (Lewis).) Because it found VFI to be a BB credit, as opposed to a higher BBB credit, which had been the underlying assumption when the Banks originally made credit available, JP Morgan recommended a number of changes to the loan agreement. (PTX 1227; D.I. 314 at 120-121 (Lewis).) Among other things, JP Morgan recommended that the Banks secure collateral from VFI, require VFI to complete a bond offering, require VFI to hedge against interest rate fluctuations, and require modification of a variety of covenants in the Credit Facility. (PTX 1227 at '976; D.I. 314 at 120-21 (Lewis).)

68. On September 30, 1998, VFI and the Banks entered into an amended agreement, which contained the changes proposed by JP Morgan. (PTX 1164; D.I. 316

---

[40]Although a BB credit rating was a step down for VFI, this rating was still equal to or greater than that of 60% of the consumer packaged goods companies in the United States. (PTX 1227 at '9975; D.I. 314 at 120:24-121:7 (Lewis); D.I. 321 at 2768:4-8 (DiSilvestro); D.I. 355 at 4732:4-13 (Luehrman).)

29

at 685-86 (Lord); D.I. 314 at 119-122, 180 (Lewis); D.I. 353 at 4123-25, 4249-50
(Owsley[41]); PTX 825.)

69.    Mr. Lewis, VFI's CFO, did most of the negotiating with the Banks. In
October 1998, shortly after the Credit Facility was successfully amended, Mr. Bernstock
terminated Mr. Lewis and placed another member of VFI's management team, Mr.
Goldstein, in the position of CFO, although Mr. Goldstein had no prior experience in the
management of a financially leveraged business. (D.I. 314 at 181:24-182:17 (Lewis);
2529:25-2530:14 (Bernstock).)

H.    VFI's Stock Price

70.    After the Spin-off, VFI's stock price generally outperformed its peers in the
S&P mid-cap food index[42] over the period from the date of the Spin-off through January
1999.    (DTX 1667; DTX 1226; D.I. 355 at 4740:19-4744:2, 4745:16-4746:23
(Luehrman[43]).)  That performance was achieved notwithstanding full disclosure to the

---

[41]Henry Owsley is the CEO of Gordian Group, which is a "financial advisory firm
that deals primarily in financially-troubled situations, restructurings and other complex
situations." (D.I. 352 at 3969:15-20 (Owsley).)  Owsley was hired by VFB "as a rebuttal
expert with respect to Dr. Luehrman's report." (Id. at 3972:11-13.)

[42]The S&P mid-cap food index reflects the stock performance for mid-size food
companies. D.I. 355 at 4746 (Luehrman).)  Because many of these companies had
market values similar to VFI, around $1 billion, it is useful to compare VFI's stock
performance to this index to see how it performed with respect to similarly situated
companies. (Id.)

[43]Timothy Luehrman is the Managing Director of Standard and Poors' Corporate
Value Consulting. He testified as an expert for Campbell, and was "hired by the
defendants to respond to allegations that, in connection with the spinoff of VFI, that VFI
did not receive reasonably equivalent value as of the spinoff date, that VFI was
insolvent as of the spinoff date, and VFI was inadequately capitalized at the spinoff date
and lacked an ability to pay its debts as of that date." (D.I. 354 at 4626:13-15, 4630:6-
14 (Luehrman).)

30

market of information with potentially negative consequences, including: (I) SEC Form
10 disclosures; (ii) VFI's results in the third and fourth quarters of FY1998, after the
Spin-off; (iii) market reports of the anticipated cost to realign shipments with
consumption, or to "de-load"; and (iv) VFI's inability to satisfy its bank loan covenants
and its consequent covenant renegotiation with the Banks.  In the face of these and
other disclosures, the value of the VFI Businesses, as measured by its equity
capitalization plus the $500 million Credit Facility obligation, never fell below $1.1 billion
between the date of the Spin-off and January 1999.  (Id.)[44]

71.    The stock market's valuation of VFI's equity is corroborated by other
contemporaneous market evidence in the record.  Most significantly, in a July 1998
internal VFI document, VFI estimated its own enterprise value at $1.56 billion, which
would put the value of the VFI Businesses at about $1.35 billion.[45]  (DTX 391 at '8549.)
In the months preceding the Spin-off, Goldman valued the equity of VFI in the range of
$1 billion to $1.2 billion, implying a value for the VFI Businesses of $1.5 to $1.7 billion.
(DTX 437; D.I. 321 at 2747:10-11 (DiSilvestro).)  Shortly before the Spin-off, VFI's
independent outside advisor, Georgeson and Company, looked at a number of

---

[44]By the end of 1998, VFI's stock price had recovered nearly to its full Spin-off
price.  (Id.)  Analysts reports in 1998 show that the mix of information in the market
about the impact of loading on FY1998 included the view that it was $16 to $17.5
million, i.e., higher than the figure used by Drs. Hallman and Titman. (DTX 394 at 5, 26;
DTX 428 at '4540, '4549; D.I. 355 at 4744:3-4745:7 (Luehrman).)

[45]VFB argues that VFI's enterprise value excluded about $146 million in debt that
is included in the value of the VFI Businesses transferred in the Spin-off.  See infra,
F59.  Consequently, assuming that is true, the value of those businesses, as
transferred, is about $146 million less than their enterprise value due to the increased
debt level.

31

valuations, such as those done by Goldman and by another VFI advisor, Braxton
Associates ("Braxton"), and an investor survey, and estimated a range of between $800
million and $1.4 billion for VFI's equity, implying a value for the VFI Businesses of $1.3
billion to $1.9 billion. (DTX 437.) Such contemporaneous evidence of fair market value
has the advantage of being untainted by hindsight or post-hoc litigation interests.

I.      VFI's 1999 Operating Plans

72.     In March and April 1998, VFI's business unit managers prepared their
operating plans for FY1999, their first full year as an independent, SEC-reporting
company. (DTX 363; PTX 712; D.I. 315 at 320:19-21, 343:19-24 (Dorsch); D.I. 316 at
769:20-770:18 (Kessler).)

73.     Mr. Bernstock explicitly directed the VFI managers who prepared the 1999
operating plans to develop specific programs to address "genuinely complex
challenges" based on a solid understanding of their businesses. (DTX 334 at '0071;
D.I. 320 at 2477:18-2478:11 (Bernstock).) The operating plans were required to
contain "a level of tactical content that we would each put our own money into." (Id.)

74.     The VFI managers had personal financial incentives to be conservative
and realistic in preparing the 1999 operating plans, since 70% of their compensation
depended on their achieving at least 90% of the operating plan results. (DTX 708 at
'8866; DTX 390 at '7375-81; D.I. 318 at '1471:2-21 (O'Malley).)

75.     The 1999 operating plans were prepared with the benefit of two
management consultants, Braxton and Swander Pace. (D.I. 315 at 317:14-21, 320:1-3;
350:11-19 (Dorsch).) Consistent with Mr. Bernstock's instruction, the 1999 operating
plans specifically addressed the challenges facing VFI, including declining sales trends

32

(DTX 363 at '1052, '1077, '1079; PTX 712 at '0850, '0867), lack of advertising support during FY1998 (DTX 363 at '1082), increased price premiums (DTX 363 at '1107), problems with plant and equipment (DTX 363 at '1138-39), aging pickle pasteurizers (DTX 363 at '1155-56), inventory realignment (PTX 712 at '0864), distribution losses, reduced shelf space, and margin creep (PTX 712 at '0880, '0885). (D.I. 320 at 2488:2-2489:17 (Bernstock); D.I. 355 at 4706:16-4707:5 (Luehrman).) The plans contemplated relatively modest improvement over VFI's FY1997 performance, based on specific new business initiatives. (DTX 363 at '1062, '1065, '1071; D.I. 315 at 347:8-11 (Dorsch); D.I. 355 at 4703:13-4704:22 (Luehrman).)

76.    The operating plans projected EBIT of $126 million and projected EBITDA of $172 million.[46]  (DTX 390 at '7330, '7335, '7337.) VFI did not need to achieve this level of profitability in order to satisfy its interest obligations. There was a substantial interest coverage "cushion" in the event that VFI fell short of its projections. At the operating plan level of $172 million of EBITDA and projected interest payments of $45 million (DTX 390 at '7330), VFI had a coverage ratio (*i.e.*, EBITDA divided by interest obligation) of 3.8. If, however, VFI fell approximately $30 million short in EBITDA, it would still have a coverage ratio of 3.2. (D.I. 353 at 4173:20-4174:15 (Owsley); D.I. 320 at 2424:15- 2425:8 (Bernstock).) In its June 1999 bond offering, with a significantly lower coverage ratio (2.5), VFI had access to $200 million of new, unsecured,

---

[46]Depreciation and amortization are non-cash expenses and thus ought not affect the ability of a company to pay back its obligations in the short term. Further, capital expenditures, which are not accounted for by EBITDA, may be postponed if a company has trouble repaying lenders. Therefore, EBITDA is considered a useful financial measure for judging a company's ability to make interest or debt payments.

subordinated debt. (DTX 29 at '1348; DTX 501 at '1559; D.I. 320 at 2514:1-7 (Bernstock).)

J.     The 1999 Bond Offering

77.    In that bond offering, which occurred approximately 15 months after the Spin-off, VFI successfully sold $200 million of unsecured bonds to a group of 29 institutional investors. (DTX 511 at '1361.) The bonds were contractually subordinated to VFI's Credit Facility debt, meaning that the Banks had to be paid in full before the bondholders could recover, in the event of a bankruptcy or liquidation of VFI. (DTX 501 at '1563.) The purchasers of the bonds had available to them the financial figures for the last twelve months, through May 2, 1999, which showed approximately $66 million of EBIT ($110.9 EBITDA less $45.2 million depreciation and amortization), substantially below the 1999 operating plan EBIT projection of $126 million.[47] (DTX 501 at '1559; DTX 390 at '7330, '7332.) The record reflects that, in conjunction with the bond offering, the rating agencies assigned to VFI a corporate credit rating of BB, the same as the rating that the Banks had given VFI in August 1998. (D.I. 355 at 4732:14-21 (Luehrman).)

78.    In the 165-page offering circular for the bonds (DTX 501), there was full disclosure of all facts and circumstances of the Spin-off, VFI's performance thereafter, the status of the bank financing to which the bonds were subordinated, and the numerous risk factors attendant to the bondholders' unsecured position. (DTX 501 at

---

[47]VFB argues that the EBIT figures in the circular for the 1999 bond offering were misleading because, *inter alia*, they did not include losses from "Kattus (which had been sold) and Swift (which was being sold)." (D.I. 361, at 10, fn. 6.) If the EBIT figures did not include results from those companies, that information was still described in the offering circular. (DTX 501 at '1560 (listing the financial results for Kattus and Swift).)

'1561-68.) The bond disclosure came on the heels of many prior public disclosures about VFI, including the Form 10 and the periodic SEC filings that VFI had made during its time as an independent public company. Ms. Carter, the general counsel for VFI, was "very comfortable" signing the SEC Form S-4 for the bond offering, with full understanding that investors would rely on the disclosure in this document in making investment decisions. (D.I. 323 at 3516:6-3518:22 (Carter).) The disclosure was "as accurate as [she] knew," based on her due diligence. The accuracy and completeness of the disclosures made in connection with the bond offering have never been challenged. (D.I. 323 at 3516:6-3518:22 (Carter); D.I. 318 at 1485:16-19 (O'Malley).)

79.    The bond offering circular offered potential investors a candid assessment of VFI's business, including a statement of the risks and challenges facing VFI. For example, the offering circular disclosed (1) that there had been limited advertising of VFI's brands and little innovation in its products in the recent past (DTX 501 at '1553-54); (2) that the financial results for the first nine months of FY1999 had been poor, including a 3.8% decrease in net sales (DTX 501 at '1580-83, '1587-88, '1590); (3) that the company faced significant transition costs and administrative expenses, restructuring costs, unusual charges, increased marketing and advertising costs, increased IT costs, and, in the mushroom businesses, yield problems (DTX 501 at '1582, '1678-79); (4) that the divestitures of Kattus and Swift generated impairment losses, resulting in negative shareholder equity on a "book" accounting basis (DTX 501 at '1559, '1579); (5) that the mushroom supply and certain co-packing agreements would be terminated in 2000 (DTX 501 at '1599, '1565); (6) that, because of obligations to Campbell, the Company was prohibited from entering into markets for frozen soup

and broth, vegetable juice, and salsa (DTX 501 at '1601, '1617); (7) that there were
significant restrictions on the company's rights to use the Swanson trademark (DTX 501
at '1567, '1600-01, '1618); (8) that there were tax risks under the TIA and consequent
limitations on the ability to sell assets, issue common stock, merge, dissolve or liquidate
(DTX 501 at '1565, '1617-18); (9) that the company faced agricultural commodity and
foreign currency risks (DTX 501 at '1566-68) and limitations on additional borrowing
(DTX 501 at '1561); and (10) that, under the amended Credit Facility, the company
faced restrictions affecting debt repayment, new debt, and capital spending.  (DTX 501
at '1589, '1621, '1687-88.)

     80.    VFI had a deservedly weaker credit rating as of the bond offering than it
had at the Spin-off.  (D.I. 320 at 2513:2-5 (Bernstock); D.I. 355 at 4733:25-4734:9
(Luehrman).)  In addition, the credit markets in which it operated had tightened.  (Id.)
By the time of the bond offering, VFI's EBITDA to interest coverage ratio had decreased
to 2.5.  (' 29 at 1348; DTX 501 at '1559; D.I. 320 at 2514:1-7 (Bernstock); D.I. 318 at
1481:17-1482:10 (O'Malley).)  Yet the bonds continued to trade at or near par value
throughout calendar year 1999, despite a further decline in VFI's interest coverage ratio
from 2.5 to 2.2.  (DTX 632; DTX 681; DTX 1677; D.I. 355 at 4746:24-48:5 (Luehrman);
D.I. 320 at 2571:1-7 (Bernstock); D.I. 318 at 1496:4-11 (O'Malley).)

    K.    Sale of VFI Businesses

     81.    As part of the Spin-off, Campbell and VFI had, as previously noted,
entered into a TIA that restricted VFI's ability to sell its businesses for at least two
years, to avoid a ruling from the IRS that could cause the Spin-off to be taxable to

Campbell and its shareholders.[48]  (PTX 3 at §6.2(a)(I); D.I. 318 at 1545-47 (McCarthy).)

The TIA did, however, allow for VFI to sell its business before the expiration of two

years if VFI received an Opinion of Counsel or a ruling from the IRS that stated that the

proposed sale of the business would not affect the tax-free nature of the Spin-off and

Campbell was "reasonably satisfied" with the opinion or ruling.  (PTX 3, § 6.2(c) at

1606; D.I. 320 at 2274:22-2276:21 (Hays[49]); D.I. 354 at 4586:21-4587:13 (Wessel[50]).)

      82.    VFI began exploring a possible sale of Swift in September 1998.  (DTX

423 at '2802; DTX 697 at '3419-20; D.I. 320 at 2277:2-14 (Hays); D.I. 318 at 1545:1-24

(McCarthy).)  At that time, Campbell decided that it was not reasonable to allow the sale

of any of VFI's businesses, because of the large potential tax liability for Campbell and

VFI that could result.[51]  (D.I. 318 at 1551:6-15, 1552:6-9 (McCarthy).)  VFI's employee

in charge of managing the tax ramifications of the sale of VFI Businesses, Kathy

McCarthy, agreed with Campbell's assessment.  (Id.)  Despite that initial assessment,

however, Ms. McCarthy continued to look for a way to sell Swift, while avoiding any tax

liability.  (Id.)  She soon discovered information previously unknown to her concerning

---

[48]VFI was, however, able to sell Kattus.  (D.I. 318 at 1547:4-10 (McCarthy).)  VFI sold Kattus for over $20 million in January 1999.  (DTX 104 at 2.)  This sale price was better than the $15 million value that VFI had estimated for Kattus shortly after the Spin. (DTX 391 at '550.)

[49]Daniel P. Hays was Vice President of Tax at the Campbell Soup Company at the time of the spinoff.  (D.I. 320 at 2197:10-11 (Hays).)

[50]Thomas F. Wessel works in the Corporate Tax Group at KPMG and testified for Campbell as an expert in spin-offs.  (D.I. 354 at 4582:22-25, 4583:1-20 (Wessel).)

[51]As part of the Spin-off VFI agreed to indemnify Campbell for any tax liability that resulted from actions taken on the part of VFI that caused the IRS to revoke the tax free treatment afforded to the Spin-off.  (PTX 3 at §§6.1(a), 7.1; D.I. 319 at 1943-44, 1967-70 (Carter).)

the tax basis of Swift. (*Id.*) Armed with this new information, Ms. McCarthy met with VFI's tax counsel, Dechert, Price & Rhoads ("Dechert"), to discuss the possibility of a sale. (*Id.* at 1553:17-24.) Dechert in turn met with Campbell's tax director to discuss a possible sale. (D.I. 320 at 2277:15-19 (Hays).) Dechert had concluded that it likely would be able to provide a tax opinion supporting such a sale. (*Id.*; D.I. 318 at 1555:2-21 (McCarthy).) By January 1999, Dechert provided an opinion which stated that a sale of Swift would not jeopardize the IRS's earlier tax ruling. (' 697 at 3409, '3441-42.) VFI pressed forward with the planned sale and received Campbell's consent in time to conclude the sale on VFI's Board-approved schedule. (D.I. 318 at 1598:12-21 (McCarthy).)

83.     VFI sold Swift in July 1999 for $85 million. (D.I. 317 at 1309 (Parker); PTX 924 at '764-66; D.I. 316 at 929 (Pelone[52]).) Shortly after the Spin-off, VFI had estimated Swift's value at about $80 million. (DTX 391 at '550.) Moreover, VFB admits that this "sales price was reasonable ... ." (D.I. 356 ¶ F195.) The book value for Swift, however, was approximately $225 million. (PTX 924 at '764-66) Consequently, the

---

[52]Francis J. Pelone had been Director of Corporate Audit at VFI and, subsequently joined the Trustee's Office for VFI's estate. (D.I. 316 at 865:14-16, 25, 866:1-8, 894:11-16 (Pelone).)

sale of Swift resulted in VFI taking a $140 million write-off.[53]  (D.I. 317 at 1309 (Parker);

PTX 924 at '764-66; D.I. 316 at 929 (Pelone).)

84.    In April 2000, VFI sold its mushroom business for an amount between $40

and $50 million.[54] (PTX 975; PTX 994 at '965-66; PTX 10 at '2108; PTX 993 at '176;

PTX 1330). In July 1998, VFI estimated the value of that business at $70 million.  (DTX

391 at '550.)  As there were approximately two years between the 1998 estimate and

the sale, there is nothing persuasive to suggest that the July 1998 estimate was

unreasonable.

---

[53]VFB argues that Swift should have been written-down before the Spin-off.  (D.I. 356, ¶¶ F288-96.)  However, under the accounting rules as understood at the time of the Spin-off, and as confirmed by PriceWaterhouse's opinion on the Form 10 financial statements, Campbell was not required to recognize any impairments in connection with the Spin-off.  (PTX 1 at '0946.)  Campbell followed PriceWaterhouse's advice in performing pre-spin impairment testing, which confirmed that the undiscounted cash flows for the useful life of the VFI assets equaled or exceeded their net book value. Because the undiscounted cash flows test was met, no impairment recognition was required.  (D.I. 322 at 3146:23-3149:4 (Lord); D.I. 317 at 1054:21-1055:5 (O'Malley).) VFI's independent impairment testing of the same VFI Businesses after the Spin-off – which was likewise approved on audit by PriceWaterhouse – confirms that the undiscounted cash flows tests were satisfied.  (DTX 405 (handwritten notes from September 1998 discussing impairment under FAS121); D.I. 317 at 1070:3-1075:23 (Pelone); D.I. 354 at 4359:8-4361:21 (McEachern (Stephen McEachern is an expert and the Managing Partner of Vince Roberts and Company)); D.I. 353 at 4282:15-18, 4283:11-17 (McEachern).)

[54]Less than a year later, the purchaser went bankrupt, claimed the sale was a fraudulent conveyance, and settled the case for $2 million in cash and $9 million in claims against VFI's estate.  (D.I. 318 at 1579-80 (McCarthy); D.I. 319 at 1823 (Reitnauer (Jack Reitnauer was part of the mushroom business and the Director of Packing, Scheduling, Distribution and Marketing for Campbell at the time of the spin. (D.I. 314 at 243:2-11 (Reitnauer)))); D.I. 319 at 1897 (Carter); PTX 1078; PTX 1118.) As far as I can tell, neither side has provided, and I do not know, the aggregate value of the claims against VFI's estate.

L.     Post Bond Issuance

85.     By VFI's own admission, "[a]fter the bond offering, 'sort of like every day…or every week something new went bad, somewhere in the company.'" (D.I. 356 at ¶ F348 (citing Goldstein 2178-80).)  Consequently, to protect cash flow VFI had to pull back planned investments in turnaround initiatives.  (D.I. 319 at 2180 (Goldstein).)  The businesses still continued to deteriorate, and, by the end of 1999, the outlook was grim.  (D.I. 319 at 2169, 2180 (Goldstein); D.I. 319 at 2090 (Mann).)

86.     In January 2000, VFI took a $15 million charge for under-accrued trade spending in FY1999.  (D.I. 318 at 1407, 1491 (O'Malley); D.I. 320 at 2531 (Bernstock); D.I. 316 at 945, 949 (Pelone); D.I. 318 at 1661 (Adler).)  Specifically, VFI had underestimated the trade deductions granted in FY1999.  (D.I. 318 at 1660-61 (Adler); D.I. 317 at 1165-66,1175-76 (Lummis); D.I. 316 at 947-48, 1091-94 (Pelone); PTX 523 at '640.)  Trade discounts in the food business are typically negotiated between a producer's salespeople and the retailers and wholesalers for the products.  (D.I. 318 at 1660-61 (Adler); D.I. 317 at 1165-66, 1175-76 (Lummis).)  VFI did not keep actual account of all such discounts, but rather estimated their total value.  Those estimates were recorded as accrued trade expenses.  (Id.)  As it turned out, the amount of trade deductions and trade spending estimated in September 1999 was not an accurate reflection of the trade spending actually accrued in FY1999.  (D.I. 318 at 1660-61 (Adler); D.I. 317 at 1165-66,1175-76 (Lummis); D.I. 316 at 947-48, 1091-94 (Pelone); PTX 523 at '640.)  However, under the Generally Accepted Accounting Principals ("GAAP"), which govern the filing of financial disclosures with the SEC, these estimates, at the time they were made, were consistent with the information VFI then had in its

possession. (D.I. 317 at 1038:16-1041:6, 1034:19-1035:3, 1036:6-1038:15 (Pelone);

D.I. 318 at 1496:17-1498:23 (O'Malley).) The charge for the revision to the trade

spending accruals was made to the FY2000 results, the year in which the discrepancies

were discovered, in keeping with GAAP requirements. (Id.)

87.     The charge for the revision led to a violation of a covenant with the Banks.

(D.I. 317 at 1087, 1095-96 (Pelone); D.I. 318 at 1497-98 (O'Malley).) Because of the

breach of the loan covenant, PriceWaterhouse required VFI to file an amended Form

10-K/A for FY1999 with a "going-concern" audit qualification, expressing substantial

doubt as to VFI's ability to survive for a year and a day. (D.I. 316 at 950-51 (Pelone);

DTX 1113 at 65; D.I. 318 at 1496-98 (O'Malley).) The amended Form 10-K/A for

FY1999 was effective September 15, 1999, except for the going-concern qualification,

which was effective as of March 13, 2000. (Id.)

M.     Bankruptcy

88.     In FY2000, VFI hired Lazard, an investment banking firm, to explore

"strategic alternatives." (D.I. 318 at 1409-11 (O'Malley); D.I. 320 at 2346-47 (Pauker[55]).)

Lazard and VFI concluded that VFI was "not viable" due to its "excess leverage" and

that the only feasible alternative was to sell the businesses that comprised VFI at that

---

[55]David Pauker is a Managing Director of Gold & Associates, hired as a
consultant by VFI in December of 2000. (D.I. 320 at 2343:23-25, 2344:7 (Pauker).) He
and his firm deal with companies faced with a potential bankruptcy filing. (Id. at 2344:9-
15.)

41

time.[56]  (D.I. 318 at 1411-12 (O'Malley); 1032 at '664, '666, '678; PTX 1038 at '751, '762.)

89.    Due to VFI's worsening financial condition, it needed a $35 million loan from the Dorrance family, Campbell's largest shareholders, and the Banks in order to delay bankruptcy.  (D.I. 318 at 1662-64 (Adler); PTX 1049; PTX 1058; PTX 1059.) Despite that infusion of cash, on January 29, 2001, VFI filed a petition for reorganization under Chapter 11 of the Bankruptcy Code.  (D.I. 45, at ¶¶ 1, 3.)  VFB was created pursuant to VFI's Chapter 11 plan.  (Id.)

90.    During the administration of the bankruptcy case, VFI sold SonA for about $17 million and sold Freshbake for about $3 million.  (D.I. 320 at 2362-63 (Pauker); PTX 1094 at '165; PTX 1096 at '808-09, '814, '818; PTX 1103 at 2-4; PTX 1104 at 2-4.)

91.    The remaining VFI assets (Vlasic, Swanson, Swanson Canada, and Open Pit) were finally sold in May of 2001 to Pinnacle Foods Corporation for $335 million. (PTX '1190; D.I. 320 at '2356-62, 2364 (Pauker); PTX 1101 at '846; PTX 1100; D.I. 318 at 1666 (Adler); D.I. 318 at 1422-23 (O'Malley); PTX 1109 at 4-9.)  VFB agrees that the $335 million was "fair consideration" for those assets.  (D.I. 356 ¶ F364.)

---

[56]Between the Spin-off and Spring of 2000, the value of food stocks declined appreciably.  (PTX 1032 at '0653-54 (chart of the Standards & Poors Largecap, Midcap, and Smallcap Food Indices, which between 01/01/99 and 04/20/00 dropped 31.8%, 35.5%, and 39.4%, respectively).)  Despite the drop in value of food companies, contemporaneous documents show that, in April of 2000, Lazard believed that VFI's "break-up value" was in the range of $615 to $845 million, which significantly exceeded its $485 million of debt.  (PTX 1032 at '0661, '0687; PTX 1038 at '3759.)

## III.   CONCLUSIONS OF LAW

1.     The Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1334(b); jurisdiction over the parties and venue for this action are uncontested. Provisions of New Jersey law and of Title 11 of the United States Code govern this action.

### A.   Fraudulent Transfer

2.     VFB alleges that VFI fraudulently transferred $500 million to Campbell by assuming the $500 million debt obligation during the Spin-off. (D.I. 356, ¶¶ L4-71.) VFB argues that the transfer was illegal because it was constructively fraudulent and, alternatively, that it was made with actual intent to "hinder, delay or defraud" VFI's creditors. (*Id.*) The two sections of the New Jersey Uniform Fraudulent Transfer Act

43

("N.J. UFTA") that VFB relies upon for these allegations are Section 25:2-25[57] and

Section 25:2-27[58]. (*Id.*)

        1.    Standing

        3.    VFB is the successor in interest to VFI, under VFI's bankruptcy plan of

reorganization (D.I. 46, ¶ 3), and has the right to prosecute any causes of action which

VFI was entitled to bring. (*See* D.I. 356, ¶ L1; D.I. 357, ¶ L1.) VFI, which apparently

was a debtor in possession (*see id.*), had a duty to act "on behalf of the bankruptcy

estate, that is, for the benefit of the creditors." *Official Comm. of Unsecured Creditors*

---

[57]Section 25:2-25 states:

> A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:
> a. With actual intent to hinder, delay, or defraud any creditor of the debtor; or
> b. Without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:
> (1) Was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or
> (2) Intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they become due.

N.J. STAT. § 25:2-25.

[58]Section 25:2-27 states in pertinent part:

> A transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation.

N.J. STAT. § 25:2-27.

44

*of Cybergenics Corp. v. Chinery (In re Cybergenics Corp.)*, 226 F.3d 237, 243 (3d Cir. 2000). In order to fulfill that duty, it was given the right to "avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law by a creditor holding an unsecured claim." 11 U.S.C. § 544(b). This ability to avoid transfers requires that there be at least one unsecured creditor that has standing to bring the cause of action. *In re Cybergenics Corp.*, 226 F.3d at 243. "Yet, once avoidable pursuant to this provision, the transfer is avoided in its entirety for the benefit of all creditors, not just to the extent necessary to satisfy the individual creditor actually holding the avoidance claim." *Id.* (internal citation omitted).

4.     In this case, the applicable state avoidance law is the N.J. UFTA. *See* N.J. STAT. §§ 25:2-20 *et seq.*[59] As earlier noted, there are two applicable sections. The first of those only requires that there be a creditor with a claim against the estate, regardless of whether it "arose before or after the transfer was made or the obligation was incurred ... ." N.J. STAT. § 25:2-25. In contrast, § 25:2-27 requires that there be a creditor with a claim that "arose before the transfer was made or the obligation was incurred." N.J. STAT. § 25:2-27.

5.     Campbell has not challenged VFB's standing to assert § 25:2-25, as that section only requires that there be a creditor with a claim, regardless of when the claim arose. N.J. STAT. § 25:2-25. Campbell does, however, contend that VFB cannot bring a claim under Section 25:2-27 because it has not identified a single creditor with a claim

---

[59]New Jersey's codification of the UFTA applies in this case because (1) VFI and Campbell were New Jersey corporations and (2) the Spin-off occurred in New Jersey. N.J. STAT. §25:2-20 *et seq.* The applicability of New Jersey law is not contested.

that arose before the challenged $500 million transfer, in other words, with a pre-Spin claim. (D.I. 357, ¶ L11.) However, Campbell is mistaken.

6.      Under the N.J. UFTA, a creditor is defined as "a person who has a claim." N.J. Stat. § 25:2-21. A "claim" is defined as "a right to payment, whether or not the right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured." *Id*. Under this broad definition of "claim," obligations such as those under a lease, which are not fixed but "open" and fluctuating, create liability under the broad definition of "claim" in the UFTA. *SPC Plastics Corp. v. Griffith (In re Structurlite Plastics Corp.)*, 224 B.R. 27, 31 (Bankr. Fed. App. 1998).

7.      It appears that VFB has identified at least one creditor with a pre-Spin claim, specifically the landlord for VFI's corporate headquarters. (D.I. 318 at 1586:3-8 (McCarthy); D.I. 319 at 1911:18-12:3 (Carter); D.I. 317 at 1208:25-10:2 (Lummis); PTX 15; PTX 632 at '3426.) Although VFI did not become the tenant of record under the lease for that property until after the Spin-off, the lease was created in such a manner that VFI agreed to liability under the lease prior to the Spin-off. Specifically, the lease stated that, after the Spin-off was complete, VFI would become the tenant of record and Campbell would be released from all liability under the agreement. (PTX 632 at §15(g).) Consequently, prior to the Spin-off, VFI had agreed to be liable for paying rent on that property.

## 2.    Constructive Fraudulent Transfer

8.    Under both Section 25:2-25 and 25:2-27, a finding of constructive fraudulent transfer requires that a debtor make a transfer or incur an obligation and not receive "reasonably equivalent value."[60]  N.J. STAT. §§ 25:2-25, 27.  Section 25:2-25 also requires that, at the time of the transfer, the debtor "[w]as engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or ... [the debtor] [i]ntended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they become due," *i.e.*, it was inadequately capitalized.  N.J. STAT. § 25:2-25.  Section 25:2-27 requires that the "debtor was insolvent at [the time of the transfer] or the debtor became insolvent as a result of the transfer or obligation."  N.J. STAT. § 25:2-27.  Bad faith is not an element of a constructive fraudulent transfer claim under either section.[61]  *Id*. §§ 25:2-25, 27; COLLIER ON BANKRUPTCY, ¶ 548.05[1][b] (2005) (stating that the bad faith of a transferee is only considered with respect to an intentional fraudulent transfer).

9.    As discussed below, VFB has failed to prove by a preponderance of the evidence that VFI did not receive "reasonably equivalent value" during the Spin-off, or that VFI was inadequately capitalized or insolvent at the time of the Spin-off.  *See infra*, ¶¶ L10-56, L59.  Therefore, VFB's constructive fraudulent transfer claim fails.

---

[60]To succeed on a claim of constructive fraudulent transfer, a plaintiff must support the claim by a preponderance of the evidence. *Karkus v. Siefert*, 169 F. Supp. 662, 666 (D.N.J. 1958)

[61]Good faith may, however, be considered in a determination of "reasonably equivalent value." *See infra*, ¶ L14.

a.    Reasonably Equivalent Value

10.    New Jersey's version of the UFTA does not describe how to determine if an asset received by a debtor is reasonably equivalent in value to an obligation incurred by the debtor. The Bankruptcy Code also lacks a definition of "reasonably equivalent value." *Mellon Bank, N.A. v. Official Comm. of Unsecured Creditors of R.M.L. (In re R.M.L.)*, 92 F.3d 139, 148 (3d Cir. 1996). Consequently, I must look to case law for guidance on this subject. *Id*.

11.    Citing *In re R.M.L.*, 92 F.3d at 148-149, VFB argues that the "totality of the circumstances" is the appropriate test to determine if an asset represents reasonably equivalent value in an exchange. (D.I. 356, ¶ L15, n.43.) Under that test, VFB argues, I should look to factors such as whether the transaction was done at arms-length and completed in good faith. (*Id*.) Campbell argues that a simple comparison between the value of the assets received and the value of the obligation incurred is the proper way to determine if "reasonably equivalent value" was received by the debtor. (D.I. 362, ¶ L15.)

12.    Some cases have held that if the fair market value of the consideration received by the debtor is less than 70% of the fair market value of the consideration given by the debtor, then there is a lack of reasonable equivalence. *Durrett v. Washington Nat'l Ins. Co.*, 621 F.2d 201, 203-04 (5th Cir. 1980); *Madrid v. Lawyers Title Ins. Co.*, 21 Bankr. 424 (9th Cir. 1982), *aff'd on other grounds*, 725 F.2d 1197 (9th Cir.). Later cases, however, used a different approach, known as the *"Bundles"* standard, after the Seventh Circuit decision in *Bundles v. Baker*, 856 F.2d 815, 823-24 (7th Cir. 1988). See *Matter of Grissom*, 955 F.2d 1440 (11th Cir. 1992)*; Barrett v.*

*Commonwealth Fed. Sav. & Loan Ass'n*, 939 F.2d 20, 23 (3d Cir. 1991); *In Re Morris Communications NC, Inc.*, 914 F.2d 458, 466 (4th Cir. 1990). The *Bundles* standard arose in the context of determining if the proceeds from a sale of assets at foreclosure represented reasonably equivalent value. *Bundles*, 856 F.2d at 823-24. In that case, the Seventh Circuit, held that

> [I]n determining reasonably equivalent value, the court must focus on what the debtor received in return for what he surrendered. Consequently, it is appropriate to consider, as a starting point, the fair market value. However, the fact that the sale was the result of a foreclosure rather than an arm's length transaction between a willing buyer and a willing seller is also of considerable importance. Therefore, the bankruptcy court must focus ultimately on the fair market value as affected by the fact of foreclosure. ... The bankruptcy court therefore must consider such factors as whether there was a fair appraisal of the property, whether the property was advertised widely, and whether competitive bidding was encouraged.

*Id.* at 824.

13.     The *Bundles* decision held that, during a foreclose sale, it may be reasonable to receive less than fair market value for an asset, but to determine the reasonability of the sale requires an examination of all of the specific circumstances. *Id.* at 824. Later, the Supreme Court held that in a foreclosure sale complying with applicable state law, the price that an asset is sold for is, as a matter of law, reasonably equivalent value. *BFP v. Resolution Trust Corp.*, 511 U.S. 531, 545 (1994). The Court thus rejected the use of the *Bundles* test in such circumstances. However, the Court stated that, outside the context of such a sale, the "'reasonably equivalent value' criterion will continue to have independent meaning (ordinarily a meaning similar to fair market value) ... ." *Id.*

14.     In non-foreclosure situations, courts have thus continued to use the
totality of the circumstances to determine if reasonably equivalent value has been
received. See, In re R.M.L., 92 F.3d at 148-49 (stating that, after a finding that the
debtor actually received value, it is appropriate to look at the totality of the
circumstances to determine if the value was reasonably equivalent). The factors that
are often considered in a "totality of circumstances" analysis are such things as the fair
market value of the transferred assets, the relationship of the parties to one another,
and the good faith of the parties. Id. at 148. The aim is to discover "whether the
transaction conferred realizable commercial value on the debtor reasonably equivalent
to the realizable commercial value of the assets transferred." Id. at 149 (emphasis
omitted).

15.     Here, there is ample evidence that the answer to the question is "yes."
Information from the most disinterested source imaginable, the securities market, helps
to establish the fair market value of the VFI Businesses. This is not a case involving a
distress sale, in which an asset's value may be skewed downward. In fact, neither party
argues that the transfer of assets at issue here was distressed in any way. Instead, the
determination of reasonably equivalent value here is a straightforward comparison of
the amount of consideration paid to Campbell and the fair market value of the assets
transferred to VFI on the date of the Spin-off.[62] I have already found that the value of
the consideration paid to Campbell was \$500 million. See supra, ¶ F60. Consequently,

---

[62]It is important to note that to find reasonably equivalent value it must first be
shown that the debtor received something of value. In re R.M.L., 92 F.3d at 149. Here
neither side argues that VFI did not receive any value at all in the Spin-off,
consequently, this prong of the analysis has been met.

all that is left to be determined is the fair market value of the VFI Businesses at the time of the Spin.

16.     To determine the fair market value of businesses, courts have looked to market data about similar assets as the most trusted source of information. *See Peltz v. Hatten*, 279 B.R. 710, 738 (D. Del. 2002) (stating that "in determining whether a value is objectively 'reasonable' the court gives significant deference to marketplace values ... [because] [w]hen sophisticated parties make reasoned judgments about the value of assets ... it is not the place of fraudulent transfer law to reevaluate or question those transactions with the benefit of hindsight").

17.     Comparable sales from the time in question are one type of market data that can be used to determine the value of a company. *See In re Morris Communications*, 914 F.2d at 469. One problem with the use of comparable sales is that, because no two companies are identical, error can be introduced when selecting the companies to use in the comparison. *Peltz*, 279 B.R. at 738.

18.     Another method used to determine the fair market value of a company is discounted cash flow ("DCF") analysis. DCF analysis is the process of projecting the amount of free cash flow a company will generate over a foreseeable period of time and what the value of the company is at the end of that time period, a number called the "terminal value." (D.I. 352 at 4012-26.) The free cash flow and the terminal value are then discounted to present value and any debt carried by the business is subtracted. (*Id.*) The result is an estimate of the value of the business. (*Id.*) DCF analysis is also problematic, however, because the inputs used in the chosen DCF model can be highly subjective. (*Id.*)

19.    The price of a company's publicly traded common stock at the time of the

transaction is presumably an ideal data point for the determination of fair market value.

Specifically, with respect to stock traded on "the New York Stock Exchange, one of the

most efficient capital markets in the world," *PHP Liquidating, LLC v. Robbins (In re PHP*

*Healthcare Corp.)*, 128 Fed. Appx. 839, 848 (3d Cir. 2005) (Not Precedential), the value

established on the open market is the fair market value for purposes of determining

reasonably equivalent value, "[i]n the absence of any evidence of manipulation or bad

faith[.]" *Id.*

20.    The stock of VFI was traded on the New York Stock Exchange at the time

of the Spin-off. *See supra*, ¶ F57. Because of the open and public nature of the

trading, the only real concern in determining the fair market value of the company is

whether the investing public had the information necessary to properly evaluate the VFI

Businesses. Consequently, I have used the trading price of VFI's stock as the primary

factor in determining if the fair market value of the VFI Businesses was greater than

$500 million. In addition, I have considered the opinions expressed by market

participants both during and after the Spin-off, as well as the market price of

comparable companies at the time of the Spin-off, and I have considered the opinions

of the parties' experts.

i.    Price of VFI's Stock

21.    As previously noted, the value that the market placed on the VFI

Businesses at the time of the Spin-off, as inferred from VFI's public stock price, was

$1.6 billion. *See supra*, ¶ F59. Considering the information that VFB asserts the

market did not have at the time of the Spin-off, and the market's reaction when it

indisputably acquired such information, as reflected in the price of VFI common stock during and after the Spin-off, I conclude that the value of the businesses transferred in the Spin-off was greatly in excess of the purchase price of $500 million.

22.   VFB lists numerous facts about which it contends Campbell misled the public at the time of the Spin-off.  (D.I. 356, ¶ F300.)  Further, VFB contends that because the public was unaware of these facts, the price of VFI stock was higher than it otherwise would have been if the public had been properly informed.  (Id., ¶ F297.) Specifically, VFB points to such things as product loading and the foreseeability of a deload; trade spending depletion and under-accrual; the sharp decline in projected VFI FY1998 earnings; VFI's $21 (vs. $250) million borrowing capacity;[63] the financial impact of pricing changes and buying requirements in beef and mushroom supply agreements; the cost of duplicative transition services; Campbell's plan to stop utilizing a plant that VFI was to run after the Spin-off; onerous TIA sale restrictions; plans for post-Spin price increases; Campbell's control of the Swanson name; the cost and risk of VFI's building an infrastructure; unrecognized cost variances; and VFI's inability to pursue its plan to grow through acquisitions.  (Id., ¶ F300.)

23.   I examined each of these factors to determine if they materially affected VFI's stock price.  With respect to loading and deloading, I have found that there was some loading of product by the VFI Businesses before the Spin-off.  See supra, ¶ F53. From the evidence presented, however, I cannot determine exactly how much loading occurred and the extent to which it affected those businesses' financial statements.

---

[63]The $250 million figure is the difference between the $750 million originally available under the Credit Facility and the $500 million which Campbell had already drawn on it.

53

*See supra*, ¶ F53. I note, though, that Mr. Owsley, VFB's expert, calculated that EBIT for the twelve months prior to the Spin-off was increased by $14.8 million through loading (PTX 1290), while Dr. Luehrman, Campbell's expert, calculated that FY1998 EBIT was increased by $3.2 million through loading. (*Id.*) Because I am interested in the information's affect on VFI's stock price, the exact amount of loading is not as important as the investing public's awareness of the approximate extent of the loading. In a July 22, 1998 JP Morgan public analyst report, less than four months after the Spin-off, the affect of deloading on sales and profit was estimated at $50 million and $17.5 million, respectively. (PTX 394 at 26.) Mr. Owsley argues that this deloading number could encompass loading that "happened in prior periods going back to pre-history," and presumably not cover the loading he accounted for in his adjustments to VFI's financials. (D.I. 353 at 4230:15.)

24.    VFB has taken great pains, however, to point out that Campbell forced VFI to load heavily throughout the Spin-off, implying that this was not a normal occurrence. (*See, e.g.*, D.I. 356, ¶ L50.) VFB cannot now have it both ways. Either loading was a normal business practice for the VFI Businesses, or it was not a normal business practice. If it were a normal business practice, then the investing public would have been aware of it and the practice would have been properly reflected in VFI's stock price. If loading were not a normal business practice, then the JP Morgan analyst report, which estimates more loading than that alleged by VFB's own expert, would show that only four months after the Spin-off the investing public was aware that significant loading had occurred in the VFI Businesses. At the time of the JP Morgan analyst report, VFI had a market cap of about $900 million, implying a value of $1.4

billion for the VFI Businesses.[64]  (DTX 1667.)  Although less than the market value at
the time of the Spin-off, this value is still far in excess of the $500 million paid for the
VFI Businesses.

25.     The next issue is "the sharp decline in projected VFI FY1998 earnings."
VFB contends that the public was unaware of the decline.  However, although not
contained in the Form 10, the drop in projected earnings was presented to the investing
public in road shows prior to the Spin-off.  (D.I. 320 at 2420:8-19, 2492:17-2493:16
(Bernstock).)

26.     Next VFB asserts that VFI's vastly reduced borrowing capacity was hidden
from the public.  Again, while this point was not stated in the Form 10, the investing
public could be expected to deduce that VFI borrowing capacity would be materially
reduced because of its decreasing earnings.  Even absent that, however, in September
the investing public was informed that VFI had renegotiated the covenants on its bank
loans and had its borrowing capacity vastly reduced.  (D.I. 355 at 4743:22-4744:2.)
(Luehrman).)  In spite of this news, the price of VFI's stock was still such that the
implied value of the VFI Businesses was far in excess of the $500 million.  *See supra*, ¶
L32.

27.     The transition services fee, the TIA, the Swanson trademark license
restrictions, the risk of building an independent corporate infrastructure, and the two
year limit on the agreement of Campbell to use the Omaha plant, were all disclosed in

---

[64]Again, I arrive at the implied market value by adding to the market capitalization
the $500 million debt obligation that served as payment.

the Form 10. (PTX 1 at '0892, '0895, '0939-40.) Consequently, the investing public was aware of these factors at the time of the Spin-off.

28.     The inability to pursue any immediate acquisition plans should have been apparent, at the latest, four months after the Spin-off, when VFI was at risk of defaulting on its covenants under the Credit Facility. Again, VFI's stock price during this time shows that the investing public did not believe that a change in growth strategies drastically reduced the value of the VFI Businesses. *See supra*, ¶ L32.

29.     The lack of success in cutting costs was recognized weeks after the Spin-off and was evident in VFI's financials. (D.I. 315 at 405-408.) Consequently, any negative impact from this news would also have been reflected in the price of VFI stock shortly after the Spin-off. *See supra*, ¶ L32.

30.     As for the beef and mushroom supply contracts, neither side has presented persuasive evidence that information about them was or was not withheld from the public. However, it is unlikely that problems with the contracts would have negatively affected the price of VFI stock. Both the mushroom and the beef businesses were sold after the Spin-off for close to the prices they had been estimated to be worth at the time of the Spin, *see supra*, ¶¶ F83-84, which indicates that the contracts did not drive down the value of the companies. Moreover, Mr. Owsley opined that VFI's pre-Spin-off EBIT for the trailing twelve months should be reduced by only $900,000 to account for the supply agreements. (PTX 1290.) Compared to the implied market value of the VFI Businesses, which was over $1 billion, that amount is immaterial. Consequently, I conclude that any contractual problems those two businesses faced did not materially affect the value of VFI at the time of the Spin-off.

31.     As for the trade spending, VFI did delay recognizing some of the costs associated with promoting its products in 1997, and it may have done the same in 1998. *See supra,* ¶¶ F40-44. However, the impact of those decisions on VFI's value was not significant enough to make the VFI Businesses less than reasonably equivalent to the \$500 million payment. According to Mr. Owsley, unusual marketing expenses associated with the VFI Businesses, which included delayed recognition of trade spending, reduced VFI's unadjusted pre-Spin EBIT of \$131.7 million by \$8.5 million. (PTX 1290.) Even projecting such earnings into the future, however, is not enough to make a meaningful dent in the \$1.1 billion dollar gap between the implied value of the VFI Businesses and VFI's \$500 million obligation.

32.     The limited effect of the information VFB claims was misrepresented to the public can be seen in the trading of VFI's stock after the Spin-off. Nine months after the Spin, after multiple profit warnings and a restructuring of VFI's Bank debt, VFI's stock price was roughly equivalent to the price at which it had traded at the time of the Spin-off.[65] (DTX 1667; DTX1678.) One year after the Spin-off, VFI still had a market capitalization of about \$600 million, implying that the value of the businesses transferred in the Spin-off was about \$1.1 billion. (DTX 1678.) Fifteen months after the Spin-off, VFI successfully sold \$200 million of unsecured bonds to a group of 29 sophisticated institutional investors. (DTX 511 at '1361.) The bonds continued to trade at or near par throughout calendar year 1999, despite a further decline in VFI's EBITDA/Interest coverage ratio from 2.5 to 2.2. (DTX 632; DTX 681; DTX 1677; D.I.

---

[65]VFI's stock price on the date of the Spin was \$25.31, nine months later it traded at approximately \$23-\$25. (DTX 1667; DTX 1678.)

355 at 4746:24-4748:5 (Luehrman); D.I. 321 at 2571:1-7 (Bernstock); D.I. 318 at 1496:4-11 (O'Malley).) Indeed, VFI's stock continued to trade at relatively stable prices despite the fact that the market for similar food companies had dropped considerably.[66] A sound argument can be made that much of the drop in the price of VFI stock in the year after the Spin-off can be attributed to that unfavorable market climate for food companies.

33.    VFB does not even attempt to show any market valuation of VFI contemporaneous with the Spin-off that is anywhere close to the figures urged by VFB's experts. There simply is no credible evidence to justify setting aside VFI's stock price and the other contemporaneous market evidence of VFI's worth. Even if, as VFB implies, the market was suffering from some "irrational exuberance" in establishing VFI's stock price, that gives me no basis for second-guessing the value that was fairly established in open and informed trading.

                ii.      Opinions Regarding the VFI Businesses' Fair Market
                     Value Formed Independently of This Litigation

34.    In a July 1998 internal VFI document, VFI estimated its own enterprise value at $1.56 billion, which would put its estimate of the value of the VFI Businesses at a minimum of $1.35 billion. See supra, ¶ F71. Prior to the Spin-off, Goldman Sachs valued the equity of VFI in the range of $1 billion to $1.2 billion, implying a value for the VFI Businesses of $1.5 to $1.7 billion. (DTX 437; D.I. 320 at 2747:10-11 (DiSilvestro).) VFI's own independent outside advisors, Braxton and Georgeson, valued VFI's equity

---

[66]The stock price of similar food companies had dropped 21% in the year after the Spin-off. (DTX 477 at '4976.)

at between $800 million and $1.4 billion shortly before the Spin-off, implying a value for the VFI Businesses of $1.3 billion to $1.9 billion. (DTX 437.)

35.     On April 28, 1999, in a letter to major shareholders discussing VFI's FY1999 performance, Mr. Bernstock addressed the value of VFI at the time of the Spin-off, taking into account negative information about VFI that had come to light in the year following the Spin-off. (DTX 477 at '4976.) He said that had the true earnings capacity of VFI been known to the market at the time of the Spin-off, the share price of VFI's common stock would have been $14-15, rather than the $25.31 at which the stock closed at the day of the Spin-off. (Id.; DTX 1673.) At $14 to $15 per share, the resulting market capitalization is about $650 million, resulting in a value of the VFI Businesses of $1.15 billion. (Id.) Mr. Bernstock also noted that although the stock market as a whole had increased since the time of the Spin-off, the price of similarly situated food companies had decreased 21%. (Id.) At about the time of this letter, the market capitalization of VFI was approximately $600 million, rather than the $510 million one would expect if the market had believed that the original market capitalization should have been $650 million (i.e., $650 million x 79%, the percentage drop in the market for similar companies). (DTX 1678.)

36.     Despite the fact that food companies had decreased in value, and VFI was on the verge of bankruptcy, contemporaneous documents show that in April of 2000, Lazard believed that VFI's "break-up value" was in the range of $615 to $845 million. (PTX 1032 at '0661, '0687; PTX 1038 at '3759; PTX 1032 at '0653-54.)

37.    Thus the contemporaneous views of people involved both before and after the Spin-off support the conclusion that the value of the VFI Businesses was greatly in excess of $500 million at the time of the Spin.

iii.    Dr. Luehrman's Comparable Company Analysis

38.    The comparable company analysis done by Dr. Luehrman also serves to corroborate the value the market placed on VFI. A comparable company analysis looks at the values of a range of companies that are similar to the company being examined. (D.I. 354 at 4633 (Luehrman).) The value attributable to each of the comparable companies is determined by a recent sales price or the price of common stock. (Id.) The value data for the comparable companies is adjusted to account for differences in such things as company size and profit margin, and an estimated value is then determined for the company being analyzed. (Id.) A significant benefit of the market comparables approach is that it is based on data from the time in question and, assuming appropriate comparables are selected, is therefore less susceptible than a DCF analysis to the distorting effect of hindsight. (D.I. 354 at 4635 (Luehrman).)

39.    Dr. Luehrman selected six "Best Comparables" for VFI: Best Foods, Dean Foods, Goodmark Foods, H.J. Heinz, Hormel, and International Home Foods.[67] (DTX 1441; D.I. 355 at 4668:3-11 (Luehrman).)

40.    As a check, Dr. Luehrman compared his Best Comparables to comparables chosen by other market participants or observers at the time. (DTX 1417;

_____

[67]Dr. Luehrman selected companies that were comparable to VFI by applying a series of "screens" to the pool of potential comparables. (D.I. 355 at 4667-8 (Luehrman).) For example, he first eliminated all companies that were, by a factor of ten, bigger and smaller than VFI. (Id.) He also eliminated companies that only sold one type of product. (Id.)

DTX 1418; DTX 1439; D.I. 355 at 4669:5-4672:12 (Luehrman).) Comparing his
grouping to S&P's Food Industry Index, five out of six companies appeared on both
lists. (DTX 1441; DTX 1417; D.I. 355 at 4669:17-4670:1 (Luehrman).) Compared to
comparable companies selected by contemporary food industry analysts close in time
to the Spin-off, again, five of the Best Comparables appeared on both lists. (DTX 1418;
DTX 1441; D.I. 355 at 4670:5-4671:3 (Luehrman).) The one company, Goodmark, that
appeared on Dr. Luehrman's list, but not that of the analysts, had the lowest set of
multiples among the Best Comparables group, thus demonstrating a lack of bias in Dr.
Luehrman's "Best Comparables" group.[68] (DTX 1418; DTX 1441; D.I. 355 at
4670:14-4671:20 (Luehrman).)

    41.    Dr. Luehrman's market comparables approach yielded a set of nine
market indicators of the enterprise value of VFI. (DTX 1424; D.I. 355 at 4694:3-14
(Luehrman).) Eliminating what he regarded as the least reliable indicators, and
selecting the median multiples for his Best Comparables group of companies, Dr.
Luehrman concluded that VFI's enterprise value, on a minority-interest basis, was in a
range between $1.5 billion and $1.8 billion at the time of the Spin-off. (DTX 1420; DTX
1421; DTX 1424; D.I. 355 at 4694:15-4695:17 (Luehrman).) Dr. Luehrman's analysis
was persuasive and confirms that the stock price of VFI at the time of the Spin-off was
reasonable.

---

[68]A company's multiple is, among other things, a representation of how the
market views the growth prospects for a particular company. For example, when the
market prices a company so that it has a relatively large market value/EBIT multiple, the
market can be understood to be indicating that the company's EBIT will continue to
grow, or that the company has value aside from its ability to generate cash. Comparing
VFI to a company with low multiples has the effect of reducing the estimated value of
VFI, an effect contrary to Campbell's interest in this litigation.

### iv.   Mr. Owsley's Comparable Company Analysis

42.   VFB's expert, Mr. Owsley, also completed a market comparables analysis. That analysis, however, was not persuasive. Mr. Owsley made no attempt to check his list of comparable companies against the listing of comparables selected by market analysts at the time of the Spin-off. Only one of Mr. Owsley's comparable companies was included among the companies identified by equity analysts at that time as being comparable to VFI. (D.I. at 4772:7-4773:13 (Luehrman); DTX 1694.) Mr. Owsley screened food companies for those with low growth and low profitability, then excluded dairy and foreign businesses. (D.I. 352 at 4051:3-52:20 (Owsley); PTX 1311; PTX 1314; PTX 1315.) The result was a list of companies that was not comparable to VFI.

43.   After completing his comparable analysis, Mr. Owsley calculated the VFI Businesses' enterprise value at $569 million ($634 million minus a transition cost of $65 million). (D.I. 352 at 4056-57 (Owsley); PTX 1316 (chart of Mr. Owsley's comparable analysis).)

44.   Mr. Owsley next applied an illiquidity discount of 25% because of the TIA restrictions that prevented VFI from selling the majority of its businesses within two years without complying with certain conditions. (D.I. 352 at 4058:2-9, 4059:10-61:7; PTX 1316.) Mr. Owsley supported his illiquidity discount theory with studies of restricted stock. (D.I. 352 at 4059:10-61:7 (Owsley).)

45.   That illiquidity discount was not warranted. (D.I. 355 at 4770:6-4771:23, 4822:3-19 (Luehrman).) Unlike an owner of stock who is restricted from selling his shares, VFI had the flexibility to effect a sale within two years of the Spin-off, if changed circumstances necessitated it. (D.I. 354 at 4586:21-4604:21 (Wessel); D.I. 320 at

2525:1-13 (Bernstock); DTX 407 at '7520.) VFI also had the ability to, and in fact did, gain economic returns by operating its businesses for cash, which is completely unlike a person restricted from realizing a return on illiquid stock. (D.I. 355 at 4771:13-23 (Luehrman).) Mr. Owsley could identify no other analyst who applied such an "illiquidity discount" in valuing VFI. (D.I. 353 at 4225:6-8 (Owsley).)

46.     Mr. Owsley next applied a spin-off discount of 10% to reflect VFI's additional risk as a newly formed spin-off, relative to the "comparable" companies. (D.I. 352 at 4058 (Owsley).) Mr. Owsley argued that the discount was justified because the market generally demands higher returns from spin-offs to compensate for their risk as newly formed companies. (D.I. 352 at 4058, 4070-71, 4867 (Owsley).) However, analysts at the time of the Spin-off applied no such discount, (D.I. 353 at 4226:6-16 (Owsley)), which could have and would have been done, had it been appropriate.

47.     Because of the foregoing failures in Mr. Owsley's comparables analysis, I reject it as an unreliable measure of VFI's value.

                                v.     Mr. Owsley's DCF Analysis

48.     To support its claim of insolvency and lack of reasonably equivalent value, VFB relies on the discounted cash flow analysis advanced by Mr. Owsley, arguing that the value of the businesses transferred in the Spin-off "had an overall value range of $270-360 million." (D.I. 356, ¶¶ F375-90.) The same selective hindsight that undermined its market comparables analysis, however, also infects VFB's DCF approach, which makes it unpersuasive.

49.     Mr. Owsley began his DCF analysis by first reducing VFI's reported last twelve months pre-Spin EBIT from $131.7 million to $57.5 million. (D.I. 356, ¶ F377.)

63

He next projected the free cash flow for all of VFI's segments for the last quarter of FY1998 and the next five fiscal years.  (*Id.*; D.I. 352 4013-28; PTX 1292; PTX 1293; PTX 1294; PTX 1295; PTX 1296; PTX 1297; PTX 1298; PTX 1299; PTX 1300.)  From those free cash flows, Mr. Owsley subtracted $65 million for a one time restructuring charge related to the Spin-off.  (D.I. 356, ¶ F379; D.I. 352 at 4028-32; PTX 1302.)  Then, Mr. Owsley calculated what the terminal value of VFI would be after the fifth fiscal year under a constant growth model with a 10.3% discount rate and a negative 2% growth rate into perpetuity.  (D.I. 356, ¶ F380; D.I. 352 at 4037-38; PTX 1309.)  He then discounted all of the free cash flows, the terminal value, and the transition expense to present value to arrive at what VFB asserts was the value of VFI at the time of the Spin-off.  (D.I. 356, ¶ F381; D.I. 352 at 4040; PTX 1309 at 2.)

50.    The first flaw in Mr. Owsley's DCF analysis deals with the projected EBIT of Kattus. Mr. Owsley projected that Kattus would loss $6.7 million in FY1999; $6.1 million in FY2000; $5.6 million in FY2001; $5.1 million in FY2002; $4.6 million in FY2003; and be sold for working capital thereafter.  (D.I. 352 at 4024-26; PTX 1309.)  The present value of those negative cash flows equals a negative $17.85 million, as compared to the business's appraised value of $20 million.[69]  Ultimately, in January 1999, VFI sold Kattus for over $20 million.  (DTX 104 at 2.)  Mr. Owsley's assumptions about Kattus are patently unreasonable.[70]

---

[69]Mr. Owsley acknowledged that he was aware that, prior to the Spin-off, Kattus was appraised at $20 million.  (D.I. 352 at 4025:17-26:6; PTX 680 at '8282.)

[70]VFB argues that it is not reasonable to use the appraised value of Kattus because VFI was prevented from selling any of its businesses under the TIA.  (D.I. 356, ¶ DF139.)  This argument misses the point of the appraisal, which speaks to Kattus's ability to produce cash.  The analysis is rooted in cash flow.  Moreover, Kattus was

64

51.     The second flaw in Mr. Owsley's DCF analysis is his reduction by $15 million of VFI's projected EBIT for each of the five projected fiscal years, supposedly to account for increased costs incurred in operating VFI as a stand-alone company. (D.I. 353 at 4193:5-12; PTX 1290.) The document that Mr. Owsley relied on to make that adjustment plainly does not support it. The document referred to increased costs of $15 million over five years, meaning an increased annual cost of $3 million, rather than $15 million annually. (*Id.* at 4193:18-21.) The difference caused by the unsupported additional reduction is $12 million per year, totals $60 million. Moreover, contemporaneous documents showed that the estimated $15 million cost increase was part of an analysis showing that, overall, there would be a decrease in the costs of operating VFI as a stand-alone business. (DTX 185 at '1505, '1518; DTX 220 at '1877; D.I. 355 at 4759:4-17 (Luehrman); D.I. 353 at 4192:21-4194:7, 4194:23-4195:3 (Owsley).) That conclusion, which undercuts Mr. Owsley's analysis, is bolstered by the fact that Ms. MacDonnell, who was in charge of Vlasic and Swanson prior to the Spin-off, wanted to run those businesses as a stand-alone company because she believed she could cut needless overhead and run them more efficiently. (D.I. 322 at 3059 (Johnson).)

52.     The third flaw concerns a deduction taken by Mr. Owsley to account for, among other things, what he believed was reduced spending on marketing prior to the Spin-off. (D.I. 352 at 3998-90; PTX 1290.) Mr. Owsley deducted $8.5 million per year because he believed that profits were artificially increased by advertising cost cuts prior to the Spin-off, which in turn had a negative effect on future growth. (D.I. 352 at 3988-

---

exempt from the TIA. (D.I. 318 at 1547:4-10 (McCarthy).)

91.) Dr. Luehrman, on the other hand, persuasively reasoned that a manager would not spend additional millions of dollars on advertising, as Mr. Owsley's corrected EBIT presumes, without there being a corresponding increase in sales or earnings. (D.I. 355 at 4764:12-4765:7.) Moreover, I find it untenable that Mr. Owsley both takes a deduction from EBIT to account for VFI's need for increased marketing, while at the same time projecting stagnating and decreasing earnings for VFI.

53.    The fourth flaw applies to the negative 2% growth rate Mr. Owsley used in his constant growth model to estimate the value of the cash generated by VFI after the first five years. In pointing out the flaws in Mr. Owsley's DCF analysis, I have not singled out his pessimistic projections for VFI's EBIT during the first five years of the company's operations.[71] His assertion of a negative perpetual growth rate of VFI after five years, however, is particularly unreasonable. At the time of the Spin-off, the consumer price index showed estimated inflation to be about 2.8% per year. (DTX 1305.) Viewing the negative 2.0% growth rate in light of inflation, Mr. Owsley predicted that VFI would continually shrink at a real rate of 4.8% per year forever (a negative 2.0% growth rate minus 2.8% rate of inflation). If anyone actually making decisions at the time held the utterly bleak view espoused by Mr. Owsley, I have seen no evidence of it. On the contrary, the investing public had high hopes for VFI at the time of the Spin-off. (See, e.g., DTX 428, at '4535.)

---

[71]It is important to note that Mr. Owsley's projections fly in the face of what everyone involved in the Spin-off believed at that time. For the sake of simplicity, however, I have chosen to examine the flaws in Mr. Owsley's DCF analysis that are the most readily quantifiable.

54.     In short, Mr. Owsley's DCF analysis is fundamentally flawed and unpersuasive.

### vi.     Actual Cash Flows

55.     Interestingly, VFB's other economic experts, Sheridan Titman and Greg Hallman, also performed an analysis using cash flows, in this instance the actual cash flows generated by VFI, rather than projected cash flows. (D.I. 289 at 15.) In their analysis, they calculate that the "cash flows generated by VFI both through operations and through the sale of businesses – including the ultimate sale of VFI to Pinnacle – produced a value at the time of the spin-off of approximately $446 million."[72] (Id.) Despite that, they concluded in a separate analysis that $377 million was the value of VFI. (Id.) Those experts further noted that although their "$377 calculated value is lower than the $446 realized ex-post, the $446 ex-post value is certainly closer to [their] $377 value than it is to the $1.1-$1.8 billion value calculated by Dr. Luehrman and the approximately $1.6 billion value implied by the market prices at the date of the spin-off." (Id.)

56.     What VFB's experts seem to miss is that this is not an exercise to see which side's valuation comes closer to estimating what VFI's cash flow ended up being. Rather, the aim is to determine the fair market value of VFI at the time of the Spin-off. By VFB's own account, VFI's tenure as a public company was marred in highly visible ways. (D.I. 356, ¶ L307-21.) Yet, despite the very public problems faced by VFI after

---

[72]In making this calculation, Titman and Hallman used a discount rate of 11.8% to discount the cash flows generated by VFI back to the time of the Spin-off. (D.I. 289 at 15.) Although I make no finding as to the propriety of this rate, I do note that it is higher than the rate advocated by Campbell's expert, which was 9.6%. (D.I. 292 at 25.)

the Spin-off, VFB wants me to believe that the investing public would have predicted an even worse fate for VFI if it had really understood the facts at the time of the Spin. A far more reasonable conclusion, however, is that, since VFI was able to generate over $450 million in cash, even with the problems that developed, its fair market value was at least reasonably equivalent to $500 million at the time of the Spin-off.[73]

b.    Inadequate Capitalization

57.    A debtor is inadequately capitalized if its assets were unreasonably small in relation to its business or the business that it was about to engage in, or the debtor reasonably believed that it would be unable to pay its debts as they came due.  N.J. STAT. § 25:2-25.  The test for unreasonably small capital and ability to pay debts as they come due is reasonable foreseeability.  *See Moody v. Security Pac. Business Credit*, 971 F.2d 1056, 1073 (3d Cir. 1992) (holding that in the context of a fraudulent transfer, the test for determining if a business will fail due to such things as unreasonably small capital is reasonable foreseeability).  When considering if a business is inadequately capitalized, it is proper to consider the availability of credit.  *Id.*

58.    VFB argues that VFI had planned to grow its businesses and that the growth plan required time and capital.  (D.I. 356, ¶ L21.)  VFB contends that VFI's assets were unreasonably small to complete this plan.  (*Id.*)  Campbell argues that, at the time of the Spin-off, VFI's future operating plans were reasonable, and that

---

[73]Indeed, I conclude it was substantially in excess of $500 million.  For that reason, VFB's argument that all of the debt transferred to VFI in the Spin-off, a total of $646 million by their count, should be considered payment for the VFI Businesses, *see supra*, ¶¶ F59-60, is inconsequential.  I find the fair market value of the VFI Businesses at the time of the Spin-off was well in excess of $646 million.

unforeseen events caused VFI's problems, not unreasonably small assets. (D.I. 357, ¶¶ L12-13.)

59.    VFI was in the business of selling pickles, frozen foods, and other processed foods. It operated for two years after the Spin-off and successfully went to the market to borrow $200 million dollars during that time. *See supra*, ¶¶ L12-13. All of the professionals involved in the Spin-off, as well as independent third parties that purchased VFI's stock and, later, its bonds, believed that VFI's assets were adequate to operate the businesses in which it was engaged. (*Id*.) Because the most persuasive evidence runs directly contrary to its position, VFB has failed to carry its burden of proving by a preponderance of the evidence that VFI's assets were unreasonably small for the businesses in which it was engaged. Likewise, VFB has failed to prove by a preponderance of the evidence that responsible parties should have reasonably believed that VFI would be unable to pay its debts as they came due.

60.    Therefore, VFB has not proven by a preponderance of the evidence that VFI was inadequately capitalized at the time of the Spin-off.

c.    Insolvency

61.    "A debtor is insolvent if the sum of the debtor's debts is greater than all of the debtor's assets, at a fair valuation." N.J. STAT. § 25:2-23(a). As discussed above, the value of VFI's assets at the time of the Spin was greater than $646 million, the sum that VFB asserts was the total amount of VFI's debts. *See supra*, n.75. Therefore, VFI was not insolvent at the time of the Spin-off.

69

3.    Actual Intent to Defraud

62.    "A transfer made or obligation incurred by a debtor is fraudulent as to a

creditor ... if the debtor made the transfer or incurred the obligation ... [w]ith actual intent

to hinder, delay, or defraud any creditor of the debtor ... ." N.J. STAT. § 25:2-25. Actual

intent to defraud, by its nature, is rarely susceptible to direct proof, and, thus,

circumstantial evidence must suffice.[74]   *Gilchinsky v. National Westminster Bank*, 732

---

[74]The burden of proof required to establish a claim involving actual intent is
unsettled.  The conflicting case law on this point has been summarized as follows:

> Earlier cases have held that the trustee must prove actual
> intent to defraud creditors by clear and convincing evidence.
> *Matter of Foxcroft Square Co.*, 184 B.R. 671, 674 (E.D.Pa.
> 1995); *In re Taubman*, 160 B.R. 964, 984 (Bankr.S.D.Ohio
> 1993). The foregoing cases, however, analyze the burden of
> proof standard under each state's enacted version of the
> Uniform Fraudulent Conveyance Act. ... In *Plotkin v. Pomona
> Valley Imports, Inc. (In re Cohen)*, 199 B.R. 709 (9th Cir. BAP
> 1996), the Bankruptcy Appellate Panel of the Ninth Circuit
> Court of Appeals decided that determining whether transfers
> were made with actual intent to hinder, delay or defraud
> creditors utilized the same inquiry under either 11 U.S.C. §
> 548(a)(1) or the Uniform Fraudulent Transfer Act, but did not
> specify which standard applied. *Cohen*, 199 B.R. at 716.
> Generally, courts do not agree which standard applies to
> "actual intent" actions under § 548(a)(1)(A). Compare
> *Provident Life and Accident Ins. Co. v. General Syndicators of
> America, (In re Laramie Assoc., Ltd)*, 1997 U.S. Dist. LEXIS
> 14170, 1997 WL 587288, at *6 (E.D.Pa. 1997)(clear and
> convincing evidence standard) with *Thompson v. Jonovich (In
> re Food & Fibre Protection, Ltd.)*, 168 B.R. 408,
> 418((Bankr.D.Ariz. 1994)(preponderance of the evidence
> standard). See also *Development Specialists, Inc. v. Hamilton
> Bank, N.A. (In re Model Imperial, Inc.)*, 250 B.R. 776, 790-91
> (Bankr.S.D.Fla. 2000) (noting disagreement regarding which
> standard applies in Florida courts, but deciding that, under the
> Supreme Court's decision in *Grogan v. Garner*, 498 U.S. 279,
> 111 S. Ct. 654, 112 L. Ed. 2d 755 (1991), a preponderance of
> the evidence standard applies to fraudulent conveyance
> actions).

*Leibersohn v. Campus Crusade for Christ, Inc. (In re C.F. Foods, L.P.)*, 280 B.R. 103,

A.2d 482, 490 (N.J. 1999); *United States v. Tabor Court Realty Corp.*, 803 F.2d 1288,

1304 (3d Cir. 1986).  Each piece of circumstantial evidence is often referred to as a

"badge of fraud."  *Id.*

      63.    In determining actual intent under subsection a. of Section 25:2-25,

consideration may be given, among other factors, to whether:

> a. The transfer or obligation was to an insider;
> b. The debtor retained possession or control of the property
> transferred after the transfer;
> c. The transfer or obligation was disclosed or concealed;
> d. Before the transfer was made or obligation was incurred,
> the debtor had been sued or threatened with suit;
> e. The transfer was of substantially all the debtor's assets;
> f. The debtor absconded;
> g. The debtor removed or concealed assets;
> h. The value of the consideration received by the debtor was
> reasonably equivalent to the value of the asset transferred
> or the amount of the obligation incurred;
> I. The debtor was insolvent or became insolvent shortly after
> the transfer was made or the obligation was incurred;
> j. The transfer occurred shortly before or shortly after a
> substantial debt was incurred; and
> k. The debtor transferred the essential assets of the
> business to a lienor who transferred the assets to an insider
> of the debtor.

N.J. STAT. § 25:2-26.

      64.    "Although the presence of a single factor, *i.e.* badge of fraud, may cast

suspicion on the transferor's intent, the confluence of several in one transaction

generally provides conclusive evidence of an actual intent to defraud."  *Gilchinsky v.*

*National Westminster Bank N.J.*, 732 A.2d 482, 490 (N.J. 1999).  In addition to these

---

111 (Bankr. M.D. Pa. 2002).  Because I find that VFB has failed to prove actual intent to
defraud by even a preponderance of the evidence I need not further discuss the point.
*See infra*, ¶ L65.

badges of fraud, any other factors pertinent to the transaction should be considered. *Id*.

65.     I have already concluded that the $500 million obligation VFI incurred was reasonably equivalent to the businesses it received and that VFI was solvent at the time of the Spin-off. *See supra*, ¶ F56. In addition, the conduct of VFI and Campbell does not suggest an intent to hinder, delay, or defraud any creditor. Any aggressive accounting or any gloss put on information provided to the investing public was done with the intent to increase VFI and Campbell's stock price, and was not an effort to hinder, delay, or defraud creditors. *See supra*, ¶¶ F45-53. Moreover, at the time of the Spin-off, VFI and Campbell's employees believed that VFI was going to be a viable company. *See supra*, ¶¶ F11-20. Consequently, VFB has failed to show by a preponderance of the evidence that anyone had an intent to hinder, delay, or defraud any creditor in connection with the Spin.

B.      Breach of Fiduciary Duty

66.     VFB alleges that VFI's pre-Spin directors breached a fiduciary duty to VFI's foreseeable creditors. (D.I. 356 at ¶ L44-48.) This effort to state a claim has numerous short comings; however, one in particular stands out. The pre-Spin directors did not owe any fiduciary duty to future creditors of VFI. *See Francis v. United Jersey Bank*, 432 A.2d 814, 824 (N.J. 1981) ("While directors may owe a fiduciary duty to creditors also, that obligation generally has not been recognized in the absence of insolvency.") As I have ruled that VFI was not insolvent at the time of the Spin, *see supra*, ¶ L61, there was no fiduciary duty to creditors and, accordingly, the claim of a breach must fail.

C.    Campbell's Proof of Claims

67.    VFB argues that Campbell's claims against VFI's estate should be disallowed because Campbell offered no evidence establishing the validity of their claims. (D.I. 356, ¶¶ F55-56 (citing *In re Fidelity Holding Co.*, 837 F.2d 696, 698 (5th Cir. 1988).) The case cited by VFB, however, states that "[u]nder Bankruptcy Rule 301(b), a party correctly filing a proof of claim is deemed to have established a prima facie case against the debtor's assets. The objecting party must then produce evidence rebutting the claimant or else the claimant will prevail." *In re Fidelity*, 837 F.2d at 698 (internal citations omitted). VFB has not produced evidence to rebut Campbell's claims, so the argument for disallowance must fail on this record.

68.    VFB also alleges that I should disallow or subordinate Campbell's claims because of Campbell's actual or constructive fraud in the Spin-off. (D.I. 356, ¶ L55.) Because of my earlier rulings on actual and constructive fraud, this claim also fails. *See infra*, ¶¶ L9, L65.

D.    Alter Ego and Illegal Dividend

69.    VFB's last two allegations, that VFI was an alter ego of Campbell and that the Spin-off was an illegal dividend, were abandoned by VFB. VFB did not raise these claims in its proposed Findings of Fact and Conclusions of Law, and only mentioned them after Campbell noted that omission. (D.I. 361, ¶ DC24-25, 28.) Additionally, with respect to the claim that VFI declared an illegal dividend, VFB, in its response, relies on the assertion that VFI was insolvent at the time of the Spin-off or that the Spin-off caused it to become insolvent, a proposition I have already rejected. (*Id.*, DC24-25.) As for the alter ego claim, such a finding requires a showing of such factors as "failure

73

to observe corporate formalities, non-payment of dividends, the insolvency of the debtor corporation at the time, siphoning of funds of the corporation by the dominant stockholder, non-functioning of other officers or directors, absence of corporate records, and the fact that the corporation is merely a facade for the operations of the dominant stockholder or stockholders." *United States v. Pisani*, 646 F.2d 83, 88 (3d Cir. 1981). VFB has not shown that any of these factors were present at the time of the Spin-off. Consequently, both claims are without merit.

## IV.   SUMMARY OF CONCLUSIONS

In summary, for the reasons expressed herein, Campbell is not liable to VFB for actual or constructive fraudulent transfer or for the VFI Directors' alleged breach of fiduciary duty. In addition, Campbell's claims against VFI are not disallowed nor are they subordinated to other claimants. Finally, VFB's claims that VFI was an alter ego of Campbell and that VFI declared an illegal dividend during the Spin-off have been abandoned and, in any event, are rejected. The parties should confer and submit a form of judgment giving effect to the rulings herein.